WILLIAM POWELL, *et al vs.* JOSIAH BRADLEE & Co.
*December,* 1837.

The principle is unquestionable, that property in the custody of the law, cannot be *replevied ;* but where property had been first *replevied,* and there was evidence to show that the plaintiffs in that suit, had waived the delivery of the possession to them under their writ, and it was then taken under a subsequent writ, the court will not instruct the jury, that the plaintiff cannot recover, if they find that such subsequent writ issued while the property was in the custody of the sheriff.

Whether two defendants can be sued jointly in *replevin,* for several parcels of property, severally owned, and separately taken and detained? *Quere.*

But the defect of such misjoinder, (if it be one,) may be cured, by putting the party to his election; or by the verdict of the jury, finding for the plaintiff on one count, and for the defendant on the other.

The court will not instruct the jury, that a sale for cash, payable on delivery, passes no title in the property sold to the vendee, if the cash is neither paid or tendered, where there is evidence of an usage to deliver the property without demanding the cash at the time.

It does not follow that a sale is fraudulent and void, because the vendees at the time of the purchase are insolvent, and know themselves to be so, and did not communicate that circumstance to the vendors, who were ignorant thereof, and known to be ignorant by the vendees.

The party to whom, by the terms of the bill of lading, the property is to be delivered, has the legal title, and is competent to maintain *replevin* therefor.

If a sale of goods be made for cash, the vendors may, by an unconditional delivery, without a concurrent demand of the money, waive the cash payment; and such delivery unaffected by fraud on the part of the vendees,

would pass the property. But if a sale be made for cash, the purchaser will acquire no title without payment, unless that condition be waived by the vendor.

Where goods are sold upon terms of being paid for on delivery, and there is evidence of an usage in such cases, of delivering, without demanding the cash at the time; and the goods so sold are actually delivered without being paid for; it is proper that the court should leave it to the jury to say, whether the delivery was in reference to the usage, and no waiver of the cash payment; or without reference thereto, and unconditional, so as to pass the title.

If parties purchase goods knowing themselves to be insolvent, and without any expectation of paying for them, and in circumstances which preclude the vendor, by ordinary prudence, from becoming acquainted with the facts, which are concealed from him by the purchaser, who shortly afterwards fails, and applies for the benefit of the insolvent laws, the contract of sale is fraudulent and void, and passes no title.

But if under such a sale, the goods are delivered to the purchaser, and he transfers them by bill of lading to a third party, who *bona fide*, and upon the faith of such tranfer becomes his creditor, the title does pass to such third party.

In order to invalidate a sale upon the ground of fraud, it is not necessary that the jury should find, that the purchaser knew he would be unable to pay. It is sufficient, in that respect, that he should be found by the jury to be in insolvent circumstances, and had no reasonable expectation of paying for the goods purchased.

An instruction, founded upon the hypothesis, that the jury may find that certain facts did not exist, of which there was no evidence, is erroneous, as tending to mislead them in forming their verdict.

If *one* of the plaintiffs in a previous *replevin*, agrees to dispense with the actual delivery of the property taken under it, and to consider it delivered, so that the plaintiff in a subsequent *replevin* may take it as if the delivery under the first writ had been consummated, it is not competent for the plaintiffs in such first writ, to object that the property when taken under the second, was in *custodia legis*.

But the objection that the property is in *custodia legis* may be made, unless there is an agreement, dispensing with the delivery prior to the execution of the second writ, although the defendants subsequently to its execution, may agree to waive the irregularity, and to ratify and confirm the proceedings of the sheriff.

APPEAL from *Baltimore* county court.

This was an action of *Replevin* sued out on the 26th April, 1833, by the appellees trading under the firm of *Josiah Bradlee & Co.* for 510 barrels of flour, and 4424½ bushels of corn, the property of the plaintiffs taken and detained, &c. by *William Powell, Henry B. Fiddeman, John Boggs,* and

*Alexander L. Boggs,* the defendants.   The property was returned by the sheriff replevied, and delivered as per schedule, which bore date on the 29th April, 1833, and the receipt of *Andrew Hall* of that date for both, was filed by the sheriff—the defendants severed in their pleadings.   *Powell* and *Fiddeman* pleaded *non cepit,* and property in themselves in all the goods, and *J. and A. L. Boggs* also pleaded *non cepit* and property in themselves and all the goods taken, &c. The plaintiffs joined issue on the first, and replied, property in themselves in bar of the second plea, on which, issue also was joined.

At the trial the plaintiffs offered in evidence a bill of lading, for the corn and flour, bearing date 24th April, 1833, shipped by *Tyson & Norris,* of *Baltimore,* on board the brig *Joseph, Frisbee,* master, bound to *Boston,* consigned to the appellees, endorsed as follows: "*Boston,* 12th *May,* 1833. Accepted to deliver the within named corn and flour to Messrs. *Josiah Bradlee & Co.* the consignees.   *James Frisbee.*"   And also the following letters from *Tyson & Norris* to the plaintiffs, dated 18th, 19th, 23d, and 24th April, 1833, marked B, C, D, and E, and the following letter from the plaintiffs to *Tyson & Norris,* dated 20th April, 1833, marked F.

(B.)

*Josiah Bradlee & Co. Boston.*    *Baltimore,* 4th mo. 18th, 1833.

Annexed you have bill lading for 3613½ bushels splendid yellow corn on board the brig *Patapsco.*   The *Patapsco* did not take the quantity agreed, on account of other freight received, and wet weather prevented completing cargo as soon as expected.   This is truly a handsome lot, and well selected, about 1000 bushels in bottom of cargo very heavy and sound—2096 bushels choice sample, can be had in after-hatchway; the balance similar to that on top-forward-hatch we requested insurance in former letter.   If you cannot get 85 cents for this cargo on board, put it into store; think you will find it equal to the northern corn, remarkable for its cleanness, and heavy; it may be best to sell in lots of 500 bushels—72 cents offered and refused for the fellow-cargo to the 2096 bushels on board *Patapsco* to arrive, 75 asked.

Powell, *et al vs.* Bradlee & Co.—1837.

Enclosed you have bill lading for cargo corn, 2683 bushels on board the schooner *Howard*, all white and yellow mixed, except about 650 bushels good yellow. If you cannot get at least 80 cents, wish it put into store; requested insurance in a former letter—are about to load the brig *Joseph* with a cargo of corn to your address. Please keep us advised of markets. We draw on you to-day at 30 days for *N. Tyson*, for $2,000, which please honour.

Yours respectfully,     TYSON & NORRIS.

N. B.—Since writing the above we have your esteemed favour of the 15th inst. before us, and contents particularly noted. Should you be under the least apprehension of the corn we have sent you, not keeping, wish you to effect sales of such, of which we submit entirely to your better judgment. We have some in store for several weeks, and thus far keeps well—and exercise your judgments also in sales of the two cargoes here sent—will examine into accounts and take due care that the shipment now making will fully cover amount of your drafts as mentioned.

Respectfully, yours,     T. & N.

(C.)

*Josiah Bradlee & Co. Boston.*     *Baltimore, 4th mo. 19th,* 1833.
RESPECTED FRIENDS:

We advised you in ours of yesterday of having taken up brig *Joseph* to load for your address. A vessel offering after writing to you yesterday, which we liked better, and the captain of the *Joseph* preferring a freight offered him to *Portland*, we took the schooner *Sarah and Priscilla*, Chesapeake built, a good vessel of 900 bbls. burthen, and will have her despatched without delay—please get insurance effected on receipt of this, on flour, to amount of $3,000, and on corn to amount of $2,200. Insurance on corn at the lowest rate of average. We have examined our accounts since receipt of yours of 15th, at hand yesterday afternoon, and find we have drawn much closer than we had any idea of—you shall be amply covered without delay. We have no fear of the corn we have sent you respecting its keeping, as we have been

exceedingly careful—corn brought to market in February and 1st March, was damp—since, it is more generally in good condition; however, leave you free to act with any we have sent, as in your better judgments, our interest may be promoted; will, however, repeat our full reliance on very high prices for the article next month, and high in June; our idea was to sell next month, should you have any doubts of its keeping, sell such parts at least, without delay. Fresh flour will be high also in May and June, from the unusual scarcity of wheat, and we look for better price; it may be dull for a while; sales from the wharf may be best, of which, leave you free to act. Should suitable prices be offered—corn is scarce—we have bought as low as 65 a 66 cents first of this week, and put into store, no vessels being here to load; and a good supply caused a slight re-action; it is again scarce, and sales, white at 69 cents, yellow, 71 cents; considerable bought for the *Madeira* market.

Your esteemed friends,    TYSON & NORRIS.

N. B.—Since writing the above, yours of the 16th at hand, and regret that you should have had cause to complain; shall of course take better care in future."

(D.)

"*J. Bradlee & Co. Boston.*          *Baltimore, 4th mo. 23d,* 1833.
RESPECTED FRIENDS:

Yours of the 20th at hand, and regret to learn of your having refused acceptance to our draft of the 15th. We shall proceed without delay, as advised in our two last, to make shipments sufficient to satisfy you fully, and hope you will then protect the drafts drawn. The *Sarah and Priscilla* is unavoidably delayed at the ship yard, undergoing some repair to her cabin. Shall despatch her with all possible speed. The flour has been in waiting to go on board for several days—no other vessel to be had to load sooner. We wish you to exercise a wholesome discretion in effecting sales of our corn and flour.

Your esteemed friends,    TYSON & NORRIS."

Powell *et al vs.* Bradlee & Co.—1837.

(E.)

"*Josiah Bradlee & Co. Boston.*  Baltimore, 4th mo. 24th, 1833.

RESPECTED FRIENDS:

We wrote you yesterday, since which we find the *Sarah and Priscilla* will not get from the ship yard for two or three days, and having completed the loading of the brig *Joseph*, originally destined to *Portland*, concluded to send her to you—bill lading you have herewith annexed for 205 bbls. Howard street super, marked C and H, and 100 bbls. super marked S, and 100 bbls. fine flour, *Susquehanna*, marked F. This is a handsome parcel of flour: also 101 bbls. of best first middling, marked M; also, 2760 bushels heavy yellow corn, and 1664½ bushels white—the yellow can nearly all be got out separate, the white being on bottom of forward hold. This will be found a very superior cargo corn, in handsome condition. Please get insurance effected on flour to amount of $2,700, and on corn to amount of $3,100. We hope you will now have no hesitation in protecting our drafts. We regret you did not await our reply to your first intimation, that we had drawn too close. Exercise your better judgment in the disposition of our flour and corn. Flour is in better request to-day, and several sales of *Susquehanna* at 5.31¼, for export, *City Mills* 5½, and corn retains its price.

Your esteemed friend,     TYSON & NORRIS."

(F.)

"*Messrs. Tyson & Norris, Baltimore.*  Boston, April 20, 1833.

GENTLEMEN:

Your favour of the 15th inst. is before us, advising that you were loading the schooner *Howard* with corn, and had drawn another draft at 45 days for $2,500, which we have permitted to be noted for non-acceptance, and regret being obliged to do so; but we find it necessary to come to a stand. You have already drawn for nearly or quite the value of the property shipped, which is mostly corn, an article that may injure by keeping, particularly at this season, as it is said to be not well dried. We feel that there will be considerable risk in holding corn, and are of the opinion, that we

ought to proceed in the sales unless you will refund one-quarter of the amount advanced.

Respectfully, your friend,    JOSIAH BRADLEE & Co.

P. S.—Since closing the within, the schooner *Darius* has arrived—the corn is heated, and we shall have to sell it on board."

The plaintiffs then proved that the goods mentioned in said bill of lading, were shipped by *Tyson & Norris* on board the brig *Joseph*, in the port of *Baltimore*, on or before the 24th of April, 1833.

The plaintiffs further offered in evidence, a writ of *replevin* issued at suit of the defendants, *A. & J. Boggs*, and also a writ of replevin issued at suit of the defendants, *Powell and Fiddeman*, out of *Baltimore* county court, which were admitted to have been issued, the first on the 25th, and the other on the 26th April, 1833, and for the recovery of part of the flour and corn respectively, which had been so shipped by said *Tyson & Norris*.

The plaintiffs then proved by —— *Wilson*, that on the 25th of April, 1833, the said writ of *replevin* of the said *A. and J. Boggs*, was placed in the hands of him, the witness, as the deputy of the sheriff of *Baltimore* county, and that in order to the execution of said writ, he, the witness, went down on the evening of that day to the brig *Joseph*, and that not finding the captain there, he went to the shore, met with the captain, and went with him to the office of an agent of the plaintiffs, when it was agreed that the vessel should remain until 12 o'clock the next day, to see whether any amicable arrangement of said action could be effected; that on the next morning, no arrangement having been made, the said writ of *replevin* at the suit of *Powell and Fiddeman* was issued, and put into his hands, as deputy as aforesaid, and that having discovered that the said vessel had got under weigh before the time agreed upon; the witness having said writ of *replevin* in his possession, and with a view to the execution of the same, employed a vessel to pursue the *brig*, and bring back the property to which said *replevins* respec-

tively related. That said witness accordingly went in said vessel with said *replevins*, and in company with *J. Boggs*, and the agent of *Powell and Fiddeman,* in pursuit of the said brig, and overtook her, and that being about to execute said *replevins,* the captain of the said brig *Joseph* proposed to come back to *Baltimore,* to enable the witness to execute said writs there, to which the witness assented. That accordingly said brig returned, and the witness, after she came to the wharf, in the execution of said writs, began to unload the flour and corn, to which they related. That on the morning of the 27th of April, and whilst the witness in the execution of his duty under said writs, as deputy sheriff, was engaged in so unloading said flour and corn, *Mr. Murray,* another deputy of the said sheriff, came down to the wharf when he was so engaged, with the writ of *replevin* issued in this action, which is admitted to have been issued, for the recovery of the whole of said property, so replevied under the said writs of *A. & J. Boggs* and *Powell and Fiddeman.* That witness then proceeded no further in the execution of said last mentioned writs, but had then unloaded about two hundred barrels of the flour, and about one thousand bushels of the corn. That immediately afterwards, the said *Murray* executed the said writ of replevin in this action. The said witness further proved, that the said flour and corn, so taken by him under the said several *replevins* of the defendants, *A. & J. Boggs,* and of *Powell and Fiddeman,* were never in fact delivered to them, the said defendants, nor ever appraised by him before the writ in this case was served ; and that he had no knowledge of any agreement on the part of the defendants, or any of them, before the said property was replevied under the writ in this action, dispensing with the delivery to them of the corn and flour respectively, under those said writs of *replevin,* or agreeing to acknowledge delivery. The plaintiff then offered in evidence the following schedules and receipts of *A. & J. Boggs,* and of *Powell and Fiddeman.* "*A schedule* of the goods and chattels of *William Tyson* and *Lloyd Norris,* seized and taken at the suit of *John Boggs*

and *Alexander Boggs,* by virtue of a writ of *replevin,* issued out of *Baltimore* county court to the sheriff thereof, described and appraised by us the subscribers, who first being duly summoned and sworn for that purpose. Given under our hands and seals this 29th day of April, 1833.

296 barrels of flour marked F and S, at $5 19,     $1,536 24

*E. Dorsey,* [seal.] *Alex. Cummins,* [seal.] *Jacob Myers, Jr.* [seal.]

April 29th, 1833, received from the sheriff of *Baltimore* county, the above appraised flour.     Jno. Boggs & Co."

" A schedule of the goods and chattels of *Frisbee,* seized and taken at the suit of *William Powell* and *Henry B. Fidde-man,* by virtue of a writ of *replevin,* issued out of *Baltimore* county court, to the sheriff thereof directed, and appraised by us, the subscribers, who first being duly summoned and sworn for that purpose. Given under our hands and seals this the 29th day of April, 1833 :

        2,036 bushels of corn at 65c.    .    .    .    $1,323 40

*E. Dorsey,* [seal.] *Alex. Cummins,* [seal.] *Jacob Myers, Jr.,* [seal.]

*April* 29th, 1833. Received of the sheriff of *Baltimore* county the above appraised corn.

Powell & Fiddeman."

Which were admitted to have been executed by the said defendants respectively, or their authorized agents, and for the property to which these said *replevins* related : And also proved, by the said witness, that the body of said receipts was in his, witnesses hand writing. The said witness also proved that, when he first found the *brig Joseph* in the evening, she was lying abreast of the powder house, about one hundred yards from the shore, in the stream, and about half a mile from *Spears'* wharf, and that the captain had gone ashore for wood. That he understood from Mr. *Murray* at the time, that there was some agreement with *J. Boggs,* about the delivery of the flour under *Boggs' replevin* before the *replevin* in this action was served, but has no personal knowledge of any such agreement.

The plaintiffs further proved, by *Matthew Murray*, that the writ of *replevin* in this action, was placed in his hands as deputy sheriff for execution, on the morning of the 27th of *April*, 1833, and that he went with Mr. *Hall* the agent of the plaintiffs to the wharf, where the witness *Wilson* was engaged in unloading the corn and flour under the defendants' said several writs of *replevin.* That a considerable portion of the corn and flour was then unloaded, and that *J. Boggs*, one of the defendants, was then there; that it was then and there agreed between the witness and said *J. Boggs*, that *Wilson* might cease delivering the flour, and that he, *Boggs*, would consider it delivered, and receipt for its delivery; and that immediately after said agreement, and not before, he the witness, executed the plaintiff's *replevin* in this action; that he made no agreement except with *Boggs*, and that the corn and flour never were in fact delivered under the said previous writs of *replevin*, and that it was his the witnesses impression, that at the time of said agreement, he drew a receipt for the flour to be signed by *Boggs*, which *Boggs* then signed on board the vessel. The witness being then directed to the receipt of *Boggs* for the said flour, offered in evidence in this cause, then proved, that that was the receipt to which he alluded, and that it was not in his hand writing, but in the hand writing of the witness *Wilson*, and that he was not positive as to the time or place at which said receipt was given, but that the said agreement between him and *J. Boggs*, was in fact made before the plaintiff's *replevin* was served.

The defendants to support the issue on their part joined, then proved by *Edes* that he was the clerk of the defendants *A. & J. Boggs* during the month of *April*, 1833; that on the 22d of said month, the said defendants sold for cash, to *Tyson & Norris*, 296 barrels of flour, of which it was admitted that, the two hundred barrels *replevied* by the plaintiffs in this action was a part; that before this sale, the said *Tyson & Norris* had several times applied to the said *A. & J. Boggs* to sell them, *Tyson & Norris*, flour on credit, and that the said *A. & J. Boggs* had refused to sell to them on a credit;

that the said flour so sold for cash was sold on the 22d and delivered on the 23d of *April,* and delivered as witness supposed for shipment.   *Tyson & Norris* carried on business at a place about five doors from the place of business of the said *A. & J. Boggs,* and on the same wharf; that *A. & J. Boggs* had frequently sold flour before to *Tyson & Norris* for shipment, but had for some time refused to sell to them on credit; said witness further proved, that it was then, and is now, the general usage amongst flour dealers in the city of *Baltimore,* when flour is sold for cash, to deliver the flour before the cash is called for, and that by the delivery, the seller is not under said usage considered as waiving his right to the cash payment.   The defendants further proved by *Dorman,* that *Tyson & Norris* stopped payment on the morning of the 25th of *April,* 1833; that some few days afterwards, witness attended a meeting of the creditors of *Tyson & Norris,* at which *William Tyson* of said firm was present, and addressed the meeting.   That *Tyson* then stated to the meeting, that he and his partner had examined their affairs; and that the utmost they would be able to pay their creditors, was twenty cents in the dollar.   That *Tyson* then proposed to give their creditors twenty cents in the dollar, and to give the notes of *Tyson & Norris* (themselves) for that amount, in three equal instalments, payable one, two, and three years after date, without security; and in reply to the inquiries of some of the creditors, *Tyson* said, that they were unable to give security even for the twenty cents; and that *Tyson* required of the creditors a release of their claims, upon the giving of said notes by himself and partner.   The defendants also proved by *Keller,* a competent witness on their behalf, that he was present at several meetings of the creditors of *Tyson & Norris,* and heard several propositions made by the latter to their creditors.   That the first meeting took place within three or four days after the failure of *Tyson & Norris,* and that their first offer was, to pay twelve and a half cents in the dollar.   That at a subsequent meeting held a few days afterwards, they offered to give twenty cents in the dollar by

their own notes for that sum, without interest, and made payable by instalments, in one, two, and three years, and that said *Tyson* then stated, that the said sum of twenty cents was the utmost which they could pay. The defendants further proved by *Prentiss*, that he knew the brig *Joseph*, on board of which, the flour and corn to which this action relates was shipped, and that said vessel was commanded by captain *Frisby*. That on the 24th of April, 1833, the vessel was lying at the lower end of *Spears'* wharf. That on that day, the said captain had applied to him for the stores of said vessel, and told witness he would get them next morning. That on the next day, the vessel was about to drop down, and did drop down from the said wharf without her stores. The defendants here offered to prove by said witness, that at the time when said vessel was so dropping down without her stores, witness asked captain *Frisby* why his vessel was going away without her stores, and that *Frisby* replied that *Tyson & Norris* had ordered him to get out as fast as possible; but the counsel for the defendants objected to the evidence so offered, and the court sustained their objection. The said witness further proved, that after the vessel had dropped down from the wharf at which she had loaded, her boat was sent back for the stores, which were supplied; that said vessel had been in the habit of getting her stores of the witness, and that she had never before left the wharf without her stores and sent back for them, as in this instance.

The plaintiff then, by consent, called *William Sealy*, a competent witness, on their behalf, and proved by him, that he was the mate on board the brig *Joseph* when the cargo was shipped in her by *Tyson & Norris*, to part of which this action relates—that she took in her cargo at *Spear's* wharf and dropped down on the morning of the 25th of April to take advantage of the tide, the vessel not being able to get out at common tide. That the wind was then to the eastward, and light, that she dropped down about half a mile, where she anchored and remained until the next day at 11 o'clock. That they had not got their stores or caulked the

hatches of the vessel when they left *Spears'* wharf, in conse-
quence of the necessity of dropping down to take advantage
of the tide, and that it did not require more than an hour in
all to get their stores and fix their hatches; that on the even-
ing of that day after the vessel came to anchor, they sent
back for their stores, and got their wood; that the vessel was
very heavily loaded, having on board two hundred and ten
barrels of flour and forty-two hundred bushels of corn.    That
on the evening of the day the vessel dropped down, *Wilson,*
deputy sheriff, came on board, and not finding the captain,
then went to shore and made some arrangement with the
captain about the vessel's waiting until the next day, but
what the arrangement was, the witness did not know, except
from the information of the captain, who stated to witness,
that he was to wait until 12 o'clock the next day, or longer
if *Mr. Whitridge* should consider it necessary, and that on
the next day the vessel got under weigh, when she was pur-
sued and overtaken by *Wilson,* and the captain agreed to go,
and accordingly went back to the wharf.   The plaintiffs
further proved by *Fowler,* a competent witness, on their
behalf, that he was the clerk of *Tyson & Norris* for about six
weeks immediately before their failure, and kept their leger
and cash book, and that on the 22d of April, 1833, as ap-
peared by their books, they (*Tyson & Norris*) bought 300
barrels of flour from *A. & J. Boggs:* that from the 18th to
the 25th of April, their purchases amounted to about $16,000,
and their payments to about $15,000, of which latter, about
$5,000 was paid for purchases during said week; that on
the 24th of April, 1833, the day before their failure, they
(*Tyson & Norris*) drew in all, their checks for about $14,000,
of which, about $7,000 was paid, and the remainder was
returned unpaid on the 25th.    That none of these checks
were to the witness' knowledge dishonoured before the 25th,
and that witness never had the slightest notice that *Tyson &
Norris* were about to stop payment until the morning of the
25th of April; that on that morning they had sent a deposite
of $4,100 to the *Union Bank,* and had just despatched

another messenger with a further deposite of between three and four thousand dollars to said bank, when *Lloyd Norris,* one of the firm, came in and said he was sorry that they would be obliged to stop payment; that the *Union Bank* had refused to take checks on deposite, and they would be unable to go on. That a messenger was accordingly despatched after the deposite, then on its way to the *Union Bank,* the deposite recalled, and the notes and money borrowed, which made up that deposite, were immediately returned to the persons from whom they were borrowed. That witness was not particularly in the confidence of *Tyson,* but never heard either of them before the morning of the 25th, intimate that they were about to stop payment, or express the least apprehension of it. Said witness further proved that he filled up the bill of lading of the brig *Joseph;* that of the flour, in part composing said cargo, there was in all five hundred and ten barrels, of which, one hundred and one barrels were from the mills of *Tyson & Norris,* and the residue was not paid for: and of the corn, there was in all forty-four hundred bushels, of which, eight hundred and sixty-eight bushels were paid for, and the residue was not paid for. That the immediate cause of their stopping was the noting of their draft for non-acceptance by the plaintiffs, of which they, *Tyson & Norris,* were notified by the plaintiffs' letter of 20th April, offered in evidence. That his, the witness' impression up to the time of their failure, was, that *Tyson & Norris* were solvent, and that immediately after the failure, *Tyson* said he was quite confident they would pay all their debts, and that nobody would lose by them. Same witness further proved, that he examined the books of *Tyson & Norris* after their failure, for the purpose of making an estimate as the basis of their proposition to their creditors, and advised them, after this examination, to offer twenty cents certain to them, and to dispose of the property to the best advantage, and give them, the creditors, any surplus over twenty cents which it might yield; that in making this estimate he took into view the probable losses from their consignments in *Boston,* and the reduced

price which their whole property would bring, which latter was subject to a mortgage to the *Union Bank* for twenty-five thousand dollars, and which they, *Tyson & Norris*, valued at sixty thousand dollars, but which was in fact, afterwards sold for forty thousand dollars—that the whole amount of *Tyson & Norris'* consignments to the plaintiffs, from the 8th of March to the 22d of April, 1833, at the invoice price here, was $29,206, and that there was due to the plaintiff exclusive of the drafts noted by them for non-acceptance, $24,000 for drafts of *Tyson & Norris*, accepted by them previously to the consignment by the *Joseph*, and $6,000, a balance on the old account. That the consignment by the *Joseph* was on the account, and at the risk of *Tyson & Norris*, and that before the receipt of the plaintiffs' letter of the 20th of April to *Tyson & Norris*, the cargo consigned by it was intended for *Portland*, and that its destination was changed in consequence of the receipt of said letter. Said witness further proved that the defendants, *A. & J. Boggs*, made no demand for the cash before the failure, or witness would have paid it; that such demand was always promptly met; that he does not know whether *Tyson & Norris* ever applied to purchasers to give them credit on their purchases; that where purchases of corn and flour, &c. were made, the bills must first have been submitted to, and approved by one of the firm, and orders given by one of them to pay them ; that he recollects a purchase of two lots of corn made by *Tyson & Norris* of —— *Dorman*, on the 22d and 23d of April, 1833, and that *Dorman* brought in his bills for them on the 23d, and called for the cash, and that *Tyson & Norris* then gave him all the cash he asked for : that *Dorman's* bill, first lot, was for $808.50, and the second, for $1,524.60, and that for the first, they gave *Dorman* their check on the 24th, which was not paid, and on the second, they gave him their check on the same day for $750, which was paid, that he recollects also a purchase of corn from *Mr. Crawford* on the 18th of said April, which was paid by *Tyson & Norris'* check on the 24th of that month.

The defendants then proved by *Dorman*, the witness before examined, that he sold the two parcels of corn as stated by the witness *Fowler*, to *Tyson & Norris* on 22d and 23d of April; that he sent his boy to *Tyson & Norris* with the bills for the cash three times in the course of that morning, and was unable to get it; that he then went in person and asked for payment, when *Norris*, one of the firm, begged witness not to press for payment at that moment; that witness insisted upon having the whole of the money, and *Norris* then agreed that they, *Tyson & Norris*, would give witness their check for the whole amount of his two bills if he, witness, would agree to deposite their check so that it would not come round for payment until the next day in the regular course of exchange between the banks, and would also lend them his check for $800, which the witness refused to do; that the conduct of *Norris* on that occasion, produced an impression in witness' mind unfavourable to their credit; and witness still insisted on payment, and at length they gave witness one check for $800 and upwards, which witness was to deposite, and which he did deposite, and which was returned next day unpaid, and another for $750, which he was at liberty at once to present, and which was presented, and the money received upon it on same day : Said witness further proved, that at the meeting of the creditors of *Tyson & Norris* at which he was present, he never heard either of them make any offer of the surplus which their effects might produce over and above their offer of twenty cents; but on the contrary, understood that they required a release as the condition of their offer; and also proved, that about the 22d, 23d, and 24th of April, he understood from purchasers that corn was selling for more in *Baltimore* than in *Boston;* that purchasers complained that *Tyson & Norris* kept the price too high, and that in fact *Tyson & Norris* were then giving more than other purchasers. The defendants further proved by *Robert Mickle*, a competent witness on their behalf, that he was in April, 1833, and still is the cashier of the *Union Bank of Maryland;* that for some time before the failure of *Tyson & Norris* they had been in the habit of over-checking,

and that their checks upon said Bank have frequently been
refused; that it had been their daily practice for a long time
to over-check there; and they had been indulged in this prac-
tice to a great extent, and made their over-drafts good; that
the advances by the *Union Bank* to *Tyson & Norris* under
their mortgage of their real property to the Bank, amounted
to about twenty thousand dollars; that it was the practice of
*Tyson & Norris* to draw drafts upon their shipments, and
particularly upon their shipments to the plaintiffs, upon which
they got the cash at the *Union Bank* as soon as they were
drawn, and before acceptance; and that this was the case
with the two drafts noted for non-acceptance by the plaintiffs,
and that *Nathan Tyson,* the brother of one of the firm, was
the endorser upon one of those last mentioned drafts.    Said
witness further proved, that on the evening of the 23d of April,
1833, after the intelligence was received by *Tyson & Norris*
of the noting of their draft for non-acceptance by the plaintiffs,
by the plaintiffs' letter of 20th April, *Tyson,* one of the firm,
called on witness, and stated that they, *Tyson & Norris,* were
just about to dispatch a cargo of corn and flour to the plain-
tiffs by the *brig Joseph,* and that they had no doubt that upon
the receipt of it, the plaintiffs would honour their drafts, and
that the noting for non-acceptance might be kept secret; and
that witness in reply to *Tyson's* inquiries then gave him to
understand, that if the plaintiffs accepted their drafts, the
noting would not injure their credit; and that on the 20th
of April, after the failure of *Tyson & Norris,* witness wrote to
plaintiffs, urging them to accept the drafts of 16th and 18th
April, which they had previously refused to accept, to pre-
vent attachments being laid on the proceeds of the cargo of
the *Joseph* in their hands.

The defendants then offered in evidence, the said drafts of
*Tyson & Norris,* with *Nathan Tyson* endorser, which had
been cashed by the *Union Bank* for *Tyson & Norris* before
acceptance, and which had been noted for non-acceptance by
the plaintiffs; and also offered in evidence the following ac-
counts current rendered by the plaintiffs to *Tyson & Norris*

of the sale of all the consignments by *Tyson & Norris* to the plaintiffs, including the cargo of the *Joseph.*

1. Sales of flour and corn received per brig *Joseph* per account and risk of *Tyson & Norris.* Sales made 20th and 22d May, 1833, for cash, $3,140 01; at 4 months, $2,832; off charges, $690 39, including freight; nett proceeds $5,332 63 to credit of *T. & N.* Dated *Boston,* 11th July, 1833.

J. B. & Co.

2. Dr. *Tyson & Norris* in account with *J. Bradlee & Co.* Debits from 6th August, 1832, to 10th July, 1833, including balance of interest, $33,336 35. All the debits were drafts, except balance from old account, $2,488 95; $451 74 interest. $16,500 accepted between 2d and 16th April, 1833.

Credits from 14th August, 1832, to 10th July, 1833, $3,042 99. Sales of flour and corn, balance due $3,293 36 on interest.

11th July, 1835. Cr. Sales per *Joseph,* $5,332 62.

3. An interest account from 6th August, 1832, to 10th July, 1833, balance due *J. B. & Co.* $451 74.

The defendants further proved by *William Crawford,* a competent witness, on their behalf, that he, as the agent of the defendants, *Powell and Fiddeman,* sold to *Tyson & Norris,* on the 23d of April, 1833, the corn for which this action is brought; that on that day he had called to get payment of *Tyson & Norris* for corn sold them on the 18th, which he had called for several times before without getting it; that *Tyson & Norris* then told him they could not possibly pay it on that day, as they had already given more checks than their funds on that day would meet, but that they expected to be in funds next day, and would then pay him: that they then entered into a negociation with witness about the sale of the corn of *Powell and Fiddeman,* and wanted witness to sell it to them on sixty days credit, which witness refused to give, but agreed to let them have it on a short credit, the time of credit not being specified; that on the 24th, the next day, the witness sent three times to *Tyson & Norris* for the money on the sale of the 18th, and they at last gave him a check

for the amount, under a promise to deposite it, and that witness accordingly sent it up to the *United States Branch Bank* in *Baltimore,* where he kept his account, from which place, without his knowledge, it was immediately, and on same day, sent up to the *Union Bank,* and the money paid; that the delivery of the corn sold on the 23d April was completed on the 24th, and the bill of parcels sent round by him on that day to see if it was correct, and was returned with a note for the amount, at thirty-two days, which was in the hand-writing of witness' clerk; and which witness did not see until after the failure of *Tyson & Norris;* that after the failure, and on the morning of the 25th April, witness went to the store of *Tyson & Norris,* who told him they could not tell him any thing about their situation : and that they had been obliged to stop because *Nathan & J. Tyson* had told them that they could not get any more discounts—that witness then asked them to give him back the corn, as they knew they were broken on the 24th, and that *Tyson & Norris* then said they would return it if they could, and expressed their regret that they had forwarded the bills of lading for it the evening before : and also then told the witness that the vessel was gone; that on the 26th April witness discovered that the vessel was still in the port of *Baltimore,* and went again to *Tyson & Norris* and apprised them of it, to which they replied, that they thought she was gone, and *Tyson* said that he had assisted in getting her out; that soon afterwards, the owners of the corn and flour sued out their writ of *replevin* offered in evidence in this cause, and witness went down to the *Point,* when the *Joseph* was under weigh, and was beating out at the fort, with the wind dead ahead; that the witness then went with the deputy sheriff in pursuit of her and overtook her, when the captain drew a pistol and threatened them, but at last proposed to come back to *Baltimore* to enable the deputy sheriff to execute the writs of *replevin* in his hands, which was agreed to. Defendants further proved by said witness, that according to the usage amongst sellers of corn and flour in the city of *Baltimore,*

those articles when sold for cash are delivered before the cash is called for, and that the vendor by the delivery does not waive or vary his right under his sale for cash; that he has been in business in the city of *Baltimore* for fifteen or sixteen years, but does not recollect any case like this; that in his opinion, according to the usage, if flour, &c. is sold for cash, and the cash not paid, the vendor would have a right to take his property back, but that in such a case, if the property was destroyed, or the price fell whilst it was in the vendee's possession it would be the vendee's loss; said witness further proved, that during the spring of 1833, *Tyson & Norris* usually gave two or three cents a bushel more than other purchasers in the city of *Baltimore*, and that at the time of their purchase of witness on 23d of April, witness understood from purchasers here, that the price of corn was declining to the eastward. The defendants further proved by *Keller*, a witness previously examined, that at the meetings of the creditors of *Tyson & Norris*, at which he was present, he never heard any offer made by them to give their creditors any surplus which their property might yield, over and above the offer of twenty cents: but that on the contrary, *Tyson*, one of the firm, very emphatically stated, that if the offer was accepted, they, *Tyson & Norris*, must be entirely released. Defendants also proved by said witness, that in sales for flour for cash in the city of *Baltimore*, it is the general and constant usage for the seller to deliver the flour before the cash is asked, and that the seller is not considered by the delivery to have changed the contract, or to have waived his right to the cash payment under the contract; that a purchaser of flour for cash is not bound to hold the flour until the cash is paid, but that whilst it remained in the hands of the party to whom it was sold for cash, witness would consider, that under the usage in the city of *Baltimore*, he would have a right to retake his property if the party refused to pay the cash after the delivery, unless some credit had been given to the party after the delivery, or the seller had done some act amounting to giving the purchaser a credit.

The plaintiffs then proved by *Lloyd Norris,* that he was one of the firm of *Tyson & Norris,* and bought the flour in question for said firm of *A. & J. Boggs,* that his impression was, that the sale, although entered in their books, and the books of *A. & J. Boggs,* as made on the 22d, was made on the 19th of April, and that it was to be paid for on the 26th or 29th of April; that he recollects that at the time of sale, when one of those days, but which the witness does not recollect, was, as he thinks, agreed upon as the time of payment; that *Boggs* stated his reason for wishing to have the money on that day that he had large payments to make on that day, and showed witness his bill book referring to the payments then to be made : that at the time of the purchase, neither he nor his partner had the least notice of being compelled to stop payment; that on the evening of the 23d April they received the plaintiffs' letter of 20th April, advising them that the plaintiffs had noted their drafts for non-acceptance, and *Mr. Tyson,* one of the firm, went to see *Mr. Mickle,* and apprised him that they were then shipping a cargo of corn and flour by the *Joseph* to the plaintiffs, and that they had no doubt that the plaintiffs upon the receipt of it would honour their drafts, and that *Mr. Mickle* then stated to him that the noting for non-acceptance might be kept secret, and that if the plaintiffs accepted their drafts the noting would not injure their credit; that they accordingly continued their arrangements for the shipment by the *Joseph,* and that on the 24th April she completed her loading and dropt down, and witness on the 25th supposed she had actually sailed : that on the 24th they continued to meet their engagements and gave a great many checks, to meet which, on the morning of the 25th they made a deposite of $4,100, and had gone out and borrowed several thousand dollars more to deposite, when they were for the first time apprised that the *Union Bank* refused to take checks on deposite, and he and his partner then after consultation, came to the conclusion that they would be obliged to stop, and accordingly, about 11 o'clock on the morning of the 25th, they resolved to stop,

and recalled a messenger who had been sent by them to make a further deposite in the Union Bank, and restored the money and checks which they had borrowed to make said deposite, to the persons from whom they had borrowed them. That until that morning they had not the slightest notion of stopping, and did not know or believe before their failure, that they were insolvent, or that they would not be able to meet their engagements, or any of them; that immediately after their failure they returned some flour which they had bought, and were shipping for *Savannah*, to the persons from whom they had purchased it, including one hundred barrels which they bought of the defendants, *A. & J. Boggs*, on the day before their failure, and which they, *Tyson & Norris*, returned to them; that at the time of their failure their debts amounted to about $90,000, and they had large quantities of produce in the hands of the plaintiffs, and of another house in *Boston* to a still greater amount; and that they had drawn upon the latter before their failure for several thousand dollars more than their consignments to them produced, so that they (*Tyson & Norris*) are still largely indebted to the latter. That the offer of twenty cents in the dollar to their creditors was made some eight or ten days after their failure, and after *Mr. Fowler* had examined into their condition; and that it was as much, as upon that examination it was thought, their property would produce; that they sustained heavy losses by their shipments to *Boston*, not less than twenty thousand dollars, and a small loss of two or three thousand dollars by their shipments to *New York*; and that their whole property, which they estimated at sixty thousand dollars, did not produce near as much; that when the estimate was made with a view to the offer to their creditors, the losses by shipments, &c. were not ascertained, but they made allowance for the probable losses by them; that they had frequently had difficulties before their failure, and ever since the failure of *Elisha Tyson, Jr.* but had always been able to meet their engagements: that their purchases of corn and flour had not generally been made as mere expedients to raise money, although

they had sometimes raised money in that way. The plaintiffs further proved by *William Tyson*, that he was one of the firm of *Tyson & Norris*, that he had a conversation with his partner, *Norris*, shortly after the flour in question was bought by him of *A. & J. Boggs*, in which his partner told him that the flour had been bought on a short credit; that just before their failure witness met *Mr. A. Boggs* of said firm, and conversed with him in reference to this purchase. *Boggs* said to witness, " you know, *Mr. Tyson*, that our cash sales to you mean eight or ten days." Said witness further proved that he bought the corn in question of *Crawford*, and that it was bought on a credit of thirty-two days; that the cargo of the *Joseph* was originally destined for *Portland*, but was shipped to *Boston* because of the plaintiffs' letter of the 20th of April; and also, that he held the conversation with *Mr. Mickle* as stated by the witness, *Norris;* that he never assisted the captain of the *Joseph* in getting out from the wharf, and did not recollect telling *Mr. Crawford* that he had done so, and that he never gave the captain any direction about getting her under weigh as quickly as possible, or hurrying her off before she was ready to sail; and that in fact on the morning of the 25th, when he conversed with *Crawford*, he thought she was gone; that he and his partner had no idea of stopping, until the morning of the 25th, when he himself advised it under the circumstances and for the causes stated by his partner, the witness, *Norris;* that at the time when the purchases of the corn and flour in question were made, they did not believe that they were insolvent or would have to stop payment, and that they did expect, and intend to pay for them according to their contract.

The defendant further proved, that the whole property of *Tyson & Norris*, which was under mortgage to the *Union Bank*, was also under a subsequent mortgage in 1827 to secure the sum of $6,000 to the wife of *Lloyd Norris*, which said *Norris* had received from her estate.

The plaintiff then prayed the court to instruct the jury as follows :

No. 1. That if the jury shall believe from the evidence in the cause, that the sale of the flour in question was made by *John & Alexander Boggs* to *Tyson & Norris* on or before the 22d of April for cash, and that it was delivered on the 23d, and that from and after the delivery, the *Boggses* relied on the individual responsibility of *Tyson & Norris* for the payment of the purchase money, that then from the time of such delivery in the absence of fraud, the property in said flour was vested absolutely in *Tyson & Norris.*

No. 2. That if the said contract is in law such an one as may be explained by evidence of usage, there is no evidence of any such usage in this case in relation to the said contract, as to give it a different legal operation, than if no evidence of any kind had been offered in relation to the usage. Which prayers were rejected by the court, and the court informed the jury, that the usage offered in evidence, combined with the other facts in the cause, although said usage might not control or govern the legal operation of the contract, yet the same with said facts were evidence, from which the jury might infer, that there was not an unconditional delivery of the goods. That whether there was or was not an unconditional delivery of the goods, was a question of fact under the evidence, for the consideration of the jury.

The defendants excepted to said instructions.

These 1st and 2d prayers and instructions, are called the additional prayers in the arguments of the counsel.

The defendants then prayed the court to give the following instructions to the jury.

1. If the jury believe that the *replevin* issued in this cause was served before the completion of the service of the first *replevin* upon the same property, and while the property was in the custody of the sheriff, that plaintiffs cannot recover.

2. If the jury find that the *replevin* issued in this case, was for property not jointly owned or jointly taken by defendants, but part owned and taken by Messrs. *John Boggs & Co.* and part owned and taken by *Powell & Fiddeman,* then the plaintiff cannot recover in this suit.

3. If the jury believe that the sale made by *John Boggs &
Co.* was for cash, to be paid on delivery, and that such sale
was a conditional one, as against the vendor, and that said
*Tyson & Norris* neither paid nor offered to pay said money
to said *John Boggs & Co.* no title vested in them as against
the vendor, and plaintiffs are not entitled to recover.

4. If the jury believe that at the time *T. & N.* made
the purchase of *Powell & Fiddeman* and *John Boggs &
Co.* they were largely insolvent, and knew themselves to be
so, and concealed such insolvency, and that said *P. & F.*
and *J. B. & Co.* neither knew of such insolvency, nor had
the means of knowing it, then the sale is void; unless the
jury believe, that the plaintiffs are *bona fide* purchasers for
value of said property, and there is no evidence of their
being such purchasers.

5. If the jury believe that the property sought to be re-
covered in this suit, was bought and shipped by *Tyson &
Norris* for their own account to the plaintiffs, and that neither
the bill of lading nor the property ever came to the hands of
the plaintiffs, at or before the institution of this suit, and
that no orders for the purchase of said property was ever
given to said *Tyson & Norris* by the plaintiffs, or either of
them, the plaintiffs cannot recover.

6. That if the jury find from the evidence the facts sta-
ted in the defendants' second prayer, and also, that the said
several *replevins*, of *A. & J. Boggs*, and of *Powell & Fidde-
man*, were issued on different days, and without any concert
between *Boggs* and *P. & F.* placed in the hands of said
sheriff; that on the 25th of *March*, the said sheriff went
with the *replevin* of *A. & J. Boggs* to the brig *Joseph*, and
there agreed with the captain of the said brig, that he, the
captain, would wait until the next day to see whether some
arrangements could be made for the adjustment of said *reple-
vin*, that on the succeeding day, *Powell & Fiddeman* issued
their said writ of *replevin*, and placed it in the hands of the
said sheriff, and that said *replevin* being so in his hands, it
was ascertained by the sheriff, that the said vessel was getting
under weigh, and that the said sheriff took a vessel, and

went with *J. Boggs* and the agent of *P. & F.* or either of them, in pursuit of said vesssel for the purpose of taking said property under and agreeably to said several *replevins,* and putting it on board the vessel so taken by the sheriff; that on arriving at the brig *Joseph* the captain of said vessel, voluntarily proposed and agreed, to come back to *Baltimore* to enable the sheriff to take the property under said several *replevins,* and in fact returned, and that *A. & J. Boggs* never in any wise interfered with the possession of the corn, nor *Powell & Fiddeman,* or their agent, with the possession of the flour, then the plaintiffs have improperly joined in this action, two distinct causes of action against the said *A. & J. Boggs,* and the said *Powell & Fiddeman,* and therefore are not entitled to recover.

7. That if the jury find from the evidence, that before the bringing of this action, the defendants, *J. & A. Boggs,* had sued out their writ of *replevin* offered in evidence in this cause for the flour for which this action is brought, and the defendants, *Powell & Fiddeman,* had also sued out their writ of *replevin* offered in evidence in this case for the corn for which this action is brought; that under said writs, the sheriff of *Baltimore* county, before the bringing of this action, had seized and taken into his custody the said corn and flour, being then on board the brig *Joseph,* and that whilst the said sheriff, under and in execution of said writs, was engaged in taking said corn and flour out of said brig, the writ of *replevin* in this action was issued, and delivered to the said sheriff; and that under said last mentioned *replevin* the said sheriff, the said property being so in his custody, *replevied* and delivered the said property to the plaintiffs in this action, or their agent, without ever, in fact, having delivered the said corn or flour to the said defendants respectively, under their said *replevins,* and without any acknowledgment of the delivery of the said flour, by the said *A. & J. Boggs,* or either of them, or of the said corn by the said *Powell & Fiddemen,* or either of them, before the said property was so *replevied* under the writ of *replevin* in this cause, then the plaintiffs are not entitled to recover in this action.

8. That if the jury find the facts stated in the preceding, the defendants first prayer, except only that they find, that before the execution of the writ of *replevin* in this action, there was an acknowledgment of delivery by the defendant, *John Boggs*, as stated by the witness, *Murray*, then the plaintiffs are not entitled to recover the corn for which this action is brought.

9. That if the jury find from the evidence that, before the bringing of this action, the flour for which it was brought, was obtained by *Tyson & Norris* from the defendants, *A. & J. Boggs*, and the corn for which it is also brought, was obtained by said *Tyson & Norris* from the defendants, *Powell & Fiddeman*, under several and distinct contracts with said defendants respectively, and that being so obtained, the said flour and corn were shipped by said *Tyson & Norris* on board the brig *Joseph*, and that whilst there, and before the bringing of this action, the defendants, *A. & J. Boggs*, replevied the said flour, and the said defendants, *Powell & Fiddeman*, replevied said corn under their several writs of *replevin* offered in evidence in this cause, and that the said *A. & J. Boggs*, never claimed or took possession of said corn under their said *replevin*, or otherwise, and the said defendants, *Powell & Fiddeman*, never claimed or took possession of said flour under their said *replevin*, or otherwise, at any time before the bringing of this action, and that the plaintiffs or their agents, sueing out the *replevin* in this case, knew the facts above stated before this action was brought; that then the plaintiffs' causes of action, if they have any, against the said *A. & J. Boggs*, and the said *Powell & Fiddeman*, for the taking or detention of said corn and flour so obtained, under their said *replevins*, are wholly distinct, and independent causes of action, against the said *A. & J. Boggs*, and the said *Powell & Fiddeman*, and the plaintiffs have improperly joined them in this action, and are therefore not entitled to recover.

10. That if the plaintiffs, upon the evidence in this cause, have any right of action for the recovery of the proper-

ty for which this action is brought, their right and cause of action against the defendants, *A. & J. Boggs*, is wholly distinct from, and independent of their right and cause of action against the defendants, *Powell & Fiddeman*, and that the plaintiffs have in this action improperly joined such distinct and independent causes of action, against the said *A. & J. Boggs* alone, and the said *Powell & Fiddeman*, and are therefore not entitled to recover."

Which, and each of which instructions, the court (*Archer, Ch. J.*) refused to grant, but gave and granted to the jury the following prayers, directions, and instructions :

1. If the jury believe the contract for the sale of the goods in controversy was for cash, and that there was an unconditional delivery of the goods to *Tyson & Norris*, and that there was no fraud in the sale, then the legal title to the goods vested in *Tyson & Norris*, and it was competent for them to pass the title to the plaintiffs ; although they had not complied with the terms of the contract in paying for the said goods.

2. If the jury believe the sale was for cash, then *Tyson & Norris* acquired no title to the goods without the payment of cash, unless the jury should believe that the defendants waived the cash payment by delivery ; and if the jury find they did waive the cash payment by delivery, then the title vested by the delivery in *Tyson & Norris.*

3. If the jury believe that it was the usage and practice among merchants and dealers, when articles of merchandise are sold for cash, to deliver the articles without demanding the cash at the moment of delivery, then the jury are at liberty to infer that the defendants were acting in reference to such usage, and from such usage and the evidence in the cause, that the delivery was not a waiver of the cash payment, and if the jury should find the delivery was not a waiver, then the delivery of the goods did not vest the title in the vendees, if the jury find that they did not make payment for the said goods. When the court in these directions speak of a conditional delivery, and of waiving cash payments, they mean

to leave it to the jury to determine whether, in the delivery, the party meant to relinquish his right over the property, or meant to resume it in case the cash was not paid; or, in other words, did the defendants, in the delivery, mean or not, to waive any of their rights under the contract of sale and delivery.

4. If the jury believe the contract was made by *Tyson & Norris*, when in point of fact they were insolvent and unable to pay their debts, and that *Tyson & Norris* were aware of their situation, and that they had no expectation of paying the sum contracted to be paid according to the contract, and that the defendants, by ordinary prudence, could not have known of the existence of such facts, and that such facts were concealed from the defendants by said *Tyson & Norris*, and that they did in fact stop payment on the 25th of April, 1833, and did shortly after apply for the benefit of the insolvent laws, and failed to pay for the said goods, then the contract of sale was fraudulent and void, and the delivery passed no title to *Tyson & Norris*; and in such case, the plaintiffs acquired by the bill of lading and transfer no title to said goods, unless they became creditors subsequent to the delivery of the goods to *Tyson & Norris*.

5. If the jury believe from the evidence that the sale and delivery of the goods in controversy were made as stated in plaintiffs' first prayer, then the title to the goods vested by such sale and delivery in *Tyson & Norris*, notwithstanding they were insolvent at the time of such sale and delivery, and knew that they were so insolvent, unless the jury shall also find, that at the time of such sale and delivery said *Tyson & Norris* knew that they were not able to pay for the goods, and that they would not be able to pay for them, and neither intended nor expected to pay for them, and made said purchase, and obtained such delivery, with such knowledge, expectation, and intention.

6. If the jury find the sale and delivery as stated in plaintiffs' first prayer, and that at such sale and delivery, *Tyson & Norris* intended to pay for them, then the title vest-

ed in them in the goods, notwithstanding the said *Tyson &* *Norris* were then as greatly insolvent as they proved afterwards to be, and knew that fact.

These prayers were granted, provided the jury believe that the delivery of the goods was an unconditional delivery.

7. That if the jury find from the evidence that before the bringing of this action, the defendants, *A. & J. Boggs*, being the owners of the flour for which this action is brought, sold it for cash to *Tyson & Norris*, and delivered it to *Tyson &* *Norris* under said sale, and. that they, *A. & J. Boggs*, did not intend by said delivery to give credit for said flour to *Tyson & Norris*, or to waive their right to the cash payment under said contract—that after said delivery *Tyson & Norris* consigned it to the plaintiffs, on the account, and at the risk of them, the said *Tyson & Norris*, and that the plaintiffs never purchased said flour from *Tyson & Norris*, nor made them any advances, nor contracted for them any responsibilities upon said consignment; and also, that according to the general and known usage amongst flour dealers in the city of *Baltimore*, in sales of flour for cash, it is usual for the seller to deliver the flour before the cash is received or required, and that according to said usage, the seller, by its delivery, is not considered as waiving his right to the cash agreeably to the contract, and that there was no unreasonable delay on the part of *A. & J. Boggs* after the delivery of said flour in requiring the cash or the return of their flour under said contract, then the plaintiffs are not entitled to recover. When the court in these directions speak of a conditional delivery, and of waiving cash payment, they mean to leave it to the jury to determine, whether in the delivery, the party meant to relinquish his right over the property, or meant to resume it in case the cash was not paid; or in other words, did the defendants in the delivery mean or not, to waive any of their rights under the contract of sale and delivery

8. That if the jury believe, that at the time when *Tyson* *& Norris* purchased the corn, for which this action is brought, of *Powell and Fiddeman*, they, *Tyson & Norris*, were insol-

vent, and knew themselves to be so, and had no reasonable expectation of being able to pay for said corn; and that knowing their insolvent condition, they concealed it from the said *Powell & Fiddeman,* and their agents who made said sale, and that *Powell & Fiddeman,* and their said agent, did not know the insolvent condition of *Tyson & Norris,* and had no means of knowing it, either at the time of the purchase or at any time before the delivery of the corn to *Tyson & Norris,* and that *Tyson & Norris* made said purchase for the purpose of getting possession of said corn without paying for it, and transferring it to the plaintiffs, either to secure a previous debt due by them to the plaintiffs, or to protect their endorser, *Nathan Tyson,* against his previous responsibilities for them by endorsement, and that the plaintiffs never purchased said corn of *Tyson & Norris,* nor made them any advance, nor contracted any responsibilities for them upon said corn, then the said purchase and delivery of the corn, vested no title to it in *Tyson & Norris,* and the plaintiffs are not entitled to recover.

9. If the jury believe the goods were purchased on credit, and not for cash, and that the property was delivered them in the absence of fraud, the plaintiffs are entitled to recover.

10. If the jury believe that *Mr. Boggs,* one of the defendants, agreed to dispense with the actual delivery of the goods *replevied* by him, and to consider them as delivered, so that the plaintiffs' *replevin* might be executed in the same manner as it would have been if the *replevin* by *Boggs* had been first executed, and the goods delivered; then it is not competent for *John & Alexander Boggs,* or either of them, to object that the said goods at the time of the execution of this *replevin,* were in the custody of the law, and not liable to *replevin.*

11. If the jury find the agreement in the preceding prayer, and that the same was known to the other defendants at the time they signed the receipts of the 29th April for the corn, and that said defendants thereby meant to ratify and confirm what the sheriff had done, and to waive the irregularity which

might have existed in serving the present *replevin*, then it is not competent for the defendants, or either of them, claiming to be the owners of said corn, to object that the said goods were in the custody of the law, and not liable to *replevin*.

To which refusal of the court to grant the above rejected ten prayers of the defendants, and to the refusal to grant each of them, and to the granting of which prayers and instructions by the court, and to the grant of each of which, the defendants, by their counsel, prayed the leave of the court here to except.

The jury found a verdict for the plaintiffs on both issues, with nominal damages; a motion for a new trial being overruled, the defendants brought the present appeal.

The cause was argued before STEPHEN, DORSEY, CHAMBERS, and SPENCE, Judges.

McMAHON, for the appellant, contended:

1. That the goods for which this *replevin* issued, were in the custody of the law when they were *replevied* under the writ in this case, and were therefore not *repleviable*; and that being so in custody of the law when they were *replevied*, the agreement of *Boggs*, and the subsequent receipts of the defendants for the delivery of the property under their respective previous *replevins*, did not preclude the defendants from making this objection; and especially not as to the corn *replevied*; and that, therefore, the court below erred in rejecting the defendants' 1st, 7th, and 8th prayers, and in granting their 10th and 11th instructions to the jury.

2. That upon the state of facts presented by the defendants' 2d, 6th, 9th, and 10th prayers, and sustained by the whole evidence in the cause, the plaintiffs had improperly joined in this action two distinct torts and causes of action, to wit, the tort of the defendants, *A. & J. Boggs*, in taking and detaining the flour, and the tort of the other defendants, *Powell & Fiddeman*, in taking and detaining the corn. That these torts being thus separate and distinct, and the defendants, *A. & J. Boggs*, having had no connection with or agency in

the commission of the tort of *Powell & Fiddeman* as to the corn, and so *vice versa,* the joinder of these distinct torts in one action, against the whole four, is a fatal misjoinder, and the court below therefore erred in rejecting the defendants' said 2d, 6th, 9th, and 10th prayers.

3. This arises under defendants' 3d prayer, and under the court's 1st, 2d, 3d, and 7th instructions, and additional instruction No. 2, added to the record by agreement, as to the force of the usage, under which the defendants' counsel will contend, that the court receiving the evidence of the usage as to delivery of goods on sales, for cash, and admitting its application on the question, as to the nature of the delivery, as conditional or otherwise, erred in the said instructions as to the effect ascribed by them to such usage if found by the jury, and especially in directing the jury, that the usage did not control the legal operation of the contract, that if found, they were still to find that the parties acted in reference to it; and that even if usage found, and also that parties in the delivery acted in reference to such usage, in still leaving it with the jury to find the delivery conditional or otherwise.

4. This point arises under defendants' 4th prayer, and the court's 4th, 5th, 6th, and 8th instruction, all relative to fraud in the sale founded on the known and proved insolvency of the purchasers, *Tyson & Norris,* by consignment from whom the plaintiff claims; and under this it will be contended, that there is no proof in the cause that the plaintiff was a purchaser of the goods for a valuable consideration, but is shown by all the proof to have merely obtained as a security for an antecedent debt, and that therefore the court below erred in rejecting defendants' 4th prayer, and in assuming in the instructions above mentioned that there was evidence on both sides of the question. And it will also be contended, that the insolvency of *Tyson & Norris,* at the time of the purchase, known to themselves and concealed from the defendants; and, at all events, if coupled with the additional fact, that they had not at the time of the purchase a reasonable expectation of being able to pay for the goods, was in law

a fraud vitiating the sale; and that it was not necessary to make it such, to find the additional fact, that they did not intend to pay for them.

5. This is presented in the 5th prayer, and relates to the plaintiff's title to the goods *replevied* at the time of suit brought. And the point is, that *Tyson & Norris,* having purchased and shipped them on their own account, and at their own risk, and not under any orders from the plaintiff, and the plaintiff at the time of suit brought not having received the property, nor even a bill of lading for it, he, the plaintiff, had not title to maintain the action in his own name.

In argument, I propose to consider the 1st, 7th, and 8th prayer of the defendants, with the 10th and 11th instructions given by the court. An erroneous practice has crept in, in rejecting prayers and granting instructions. Alternative propositions are often overlooked, and the jury thereby misled. The inquiry here is, was the instruction granted proper, was the 8th prayer properly refused. The case looks like contempt of the process of *replevin.* The plaintiffs were agents of *Tyson & Norris.* The property was shipped on the faith of expected acceptances. There was an implied pledge of acceptance of drafts, never performed. The plaintiffs claim and hold on for antecedent debts. They are not purchasers for a valuable consideration. They had no better equity than *Tyson & Norris* have, and they are covered also with a breach of faith, in refusing to accept the bills drawn. *Tyson & Norris* could not maintain *replevin;* they could not institute the *second replevin,* even after delivery of the goods under the first. They could not reclaim the property; many States have settled this. The first action of *replevin* would have settled the right, and the property is under the protection of the law, by delivery under the first writ. The answer to this proposition, I suppose, is, that *Bradlee* is another party, with distinct rights from the defendant in the first *replevin.*

Then when does the plaintiff's right commence? In all actions, the plaintiff must have a right at common law, and when the liability of the defendant occurred, after the writ

issued, the action was not maintainable. This is true as to torts and trespass prematurely brought. The *replevin* here only involves title. It is co-extensive with trover. Its elements are property in plaintiff,—detention by defendant, and if before suit, *no detainer*, then no right to sue. A subsequent detainer will not do. The property sold to *Tyson & Norris* was by them shipped, was brought back to the wharf by the *Boggs*, and then for the first time delivered to the defendants. The possession of the officer is the possession of the law, and not of the defendants. The defendants acknowledged no possession until delivery to them; this was on the 27th, and had no existence, when the action was brought on the 26th. The custody of the law remains until its incidents are performed. The duty of appraising is one of them. The appraisement of the sheriff is an important part of his duty. No appraisement had been made under the first writ, when the property was taken under this writ. *Boggs'* act is relied upon to relieve the sheriff from this duty. He had no such power, and his consent to that effect is invalid. *Powell & Fiddeman* were owners of the corn. *Boggs* was owner of the flour. *Crawford* was agent for the corn. The agreement was with *Murray*, the deputy sheriff, and *Boggs*, alone. It could not affect the corn. The receipts are from both parties.

The 11th instruction if it assumes that the agreement with *Boggs* was made with the knowledge of all parties, is not founded on evidence. Motives of agreements are ascertained by reference to the parties; that with *Murray* merely related to *Boggs'* flour.

Has the plaintiff a right to take advantage of this constructive delivery; can he who has done wrong put one writ in conflict with another? can he cure his wrong by adopting the agreement to waive delivery? It was wrong in the sheriff to make it; he cannot thus put the defendant in possession of property, for the action of this *replevin*. This agreement cannot operate as an estoppel.; estoppels in *pais* are reciprocal, and are so from the agreement of parties. This cannot apply here. Agreement was between the sheriff and one defend-

ant; it cannot estop the plaintiff; it was not reciprocal as to him; the sheriff was not the agent of the plaintiff. This is not a technical estopel; the object of the agreement was merely to shield the sheriff from responsibility for a violation of his duty.

The 2d point involves the 2d, 6th, 9th, and 10th prayers of the defendants.

The plaintiffs have improperly joined two distinct parties. It is a misjoinder of rights. The torts were separate. This is a fatal misjoinder.

The 6th prayer presents all the material questions.

Distinct owners of corn and flour—distinct sales—each in the first instance took out a distinct *replevin* for a different part—neither claiming an interest in the property of the other, and these facts known to the plaintiffs in this action.

Can the plaintiff unite two different claims against different parties in the same action?

Test this inquiry by analogy to *trover* and trespass. *Replevin* in a limited sense is like both. *Trover* for damages—*replevin* for the thing. But the rules of joinder are the same. Where there must be different verdicts and judgments, the claims cannot be united. Mixing of claims might confuse. Multifariousness is to be avoided. Misjoinder of persons is error; this is applicable to contracts, though not to torts. Misjoinder of persons in tort is not fatal. But this is a misjoinder of causes of actions and persons—both here are wrong. One writ cannot perform the appropriate duties of two suits. Distinct torts cannot be joined in the same cause. *Gould Plea.* 209. 1 *Chit. Plea.* 98. 1 *Bac. Abr.* 54, 55. Several distinct causes of action cannot be joined in the same writ. *Jackson vs. Hagen, et al,* 20 *John.* 438. 17 *Mass.* 185, 187.

If the position of the parties here were reversed, and the defendants had sued jointly, the action could not be maintained on the proof of the goods merely being in the same ship. 1 *Co. Litt.* 145. 1 *Chit. Plea.* 73, 74, 187. *Sprague vs. Kneeland,* 12 *Wendell,* 164. The effect of such an action

on the party wrong joined, as a witness in the cause, is a material consideration. *Boggs* could not be a witness for *Powell.* This practice breaks down the rules of evidence.

Then how is the verdict to be rendered. It must be general, not for *Boggs* for the flour, and *Powell* for the corn. There can be but one verdict and judgment. Its effect on the damages illustrates the rule.

The 3d point relates to the 3d prayer, and the 1st, 2d, 3d, and 7th instructions, and the additional instructions on the subject of usage. Delivery is an equivocal act, and it was left to the jury to determine its effect. But the evidence was of an usage known and uniform, and this usage enters into the contract. The usage establishes that the lien was never surrendered. The jury finding the usage, cannot find other than a conditional delivery. Delivery, in the absence of proof, corresponds with the usage. The jury can make no inference, in opposition to usage; without proof the usage controls. The usage established, the parties acted under it, hence the delivery must have been conditional, but instead of that as a legal conclusion, it is put to the jury, whether there was a waiver of the lien or not, they were not directed to follow the conclusion of law. The court erred in treating the usage as evidence, after it had been established.

The 4th point relates to the 4th prayer, and 4th, 5th, 6th, and 8th instructions.

Fraud in the sale. It vitiated title in the purchaser; in the hands of *Tyson & Norris;* and in the hands of the plaintiffs, who did not take it for value, but for antecedent liabilities.

The 4th prayer proceeds on the ground of defect in the evidence, and is defective in assuming the plaintiff to be a subsequent creditor, of which there is no evidence. There were no advances after the shipment of this cargo. It left the jury to assume another equity than that which *Tyson & Norris* had. It gave the plaintiffs the advantage of being creditors in the transaction.

The 5th point relates to concealment of a fact in the knowledge of the purchaser not known to the vendors, and

of which the latter had no means of knowledge. This is a fraud which vacates the sale.

The court below said that insolvency, and the concealment of it when known, and the inability of the vendor to discover the fact by ordinary prudence, is not sufficient to constitute a fraud in the sale. *Tyson & Norris* knew of their insolvency; the course of their trade informed them of it; they were purchasers at a high, and vendors at a low market. Every step made their affairs worse. " In *England* the wind raises the kite, but in this transaction the kite raises the wind." The corn purchased was to be turned into gold at a known loss. They received it after knowledge of insolvency, a circumstance to be considered in connection with fraud. I do not impute fraud as the result of simple insolvency where unknown, or not concealed by a purchaser; but if he knows his insolvency and conceals it, this is evidence of fraud. Fraud is equally perpetrated by the statement of a falsehood, or suppression of a truth. The inquiry is, is the matter stated or suppressed, material to be known; under the circumstances here belief of solvency in *Tyson & Norris,* was implied. If *Tyson & Norris* had stated they were insolvent, who can doubt the result? The law exacts facts peculiarly within the knowledge of the purchaser. He is bound to disclose such. His own condition and private affairs of which he had knowledge. This case is clear of all difficulties. The fact of insolvency cannot impeach the sale, but upon known insolvency and concealment, the contract was vitiated. I do not depend on the fact standing alone, nor affecting third parties. It is between buyer and seller. And the rule is more just and imperative, as between them. They should not be permitted to retain property thus acquired; and the law, in the absence of decisions to the contrary, should not sanction it.

But let us concede that the rules of law require us to go further, and establish that *Tyson & Norris* had no reasonable expectations of being able to pay their debts. Admit that this is to be added to the principle. The expectation, to

aid the purchaser, must be a reasonable one, not vain and ridiculous. *Hawse vs. Crowe,* 21 *Serg. and Low.* 477. That a party never intended to pay is a legal conclusion from known insolvency; the party having no reasonable expectation of being able to pay. The presumption of law not to pay, follows the want of a reasonable expectation of being able to pay.

The last point in the statement refers to the shipment being for *Tyson & Norris'* own account. There was no order for the corn or flour. No title in the factor. No muniment of title with the plaintiff at the time of suit brought; no delivery, actual or symbolical. Can a factor maintain *replevin* before delivery, actual or constructive. The cases decided, are where the factor had what was equivalent to delivery before the action was commenced. Here, the suit was brought in the name of the plaintiff before he could have known of the shipment of the goods. The right of lien does not attach until reception of the bill of lading. *Walter, et al vs. Ross, et al,* 2 *Wash. C. R.* 284. *Ryberg & Co. vs. Sneel, Ib.* 403.

R. Johnson, for the appellees, contended :

1. That there was no misjoinder of parties defendants in the *replevin.*

2. That, from the evidence in the case, the court were right in leaving it to the jury, as they did in their 10th instruction, to find, that when the *replevin* in this case was served, the defendants had agreed to consider the goods seized under their *replevins* as in fact delivered, and thereby that they were not at liberty to set up the want of actual delivery, as a formal objection to the regularity of the service of the present *replevin.*

3. That upon the questions of fraud and conditional delivery in fact, or according to usage in such sales, the court in their several instructions to the jury pronounced the law of the case, and consequently, that there is no error, for which the judgment can be reversed, in the rejection of either of appellants' prayers on those questions.

I insist that the law, as actually announced by the county court to the jury, was correct.

The 2d point of the appellant relates to a question of form. It admits title, and a separate right of action in each defendant in the *replevin*. In trespass, this produces no non-suit. There may be different judgments. This doctrine, though not denied, is only applied where the trespass is in its nature incapable of being committed jointly. It is not an inquiry into the fact.

In 1 *Chitty*, 98, there are some torts which, in legal consideration are not several, as verbal slander. The action must be against one, alone. But if trespass may be committed by two, and the proof confines it to one, it is only followed by a partial failure of the plaintiff. If the analogy is followed, the tort here might unite all the defendants in the wrongful taking and detaining. So all the plaintiff can lose, is as against the one, not concerned. But even in cases when two persons ought not to be joined, the 2d, 9th, and 10th prayers, which relate to these questions, ought not to be granted. These go to defeat the action, which is not sanctioned by *Chitty*. See the effect of a joinder in slander; the defendants may *demur*. But the objection may be avoided by a *non pros.* or a release of damages as to all, but one. And all the court did here, was to refuse to declare that the plaintiff was not entitled to recover against some of the defendants. In reason there is no objection to this procedure.

The counsel has assumed a title in these defendants which the verdict denies. The custody of the law is not in issue here, but the objection relates to a case where, the undisputed owner is plaintiff, and several set up title; their claim is to defeat the whole action. It is founded on the existence of too many defendants.

The property was shipped on the 24th. On the 25th a bill of lading was forwarded to the plaintiff, and for value. This title is good against all the world but *Tyson & Norris*, it being for previous advances.

With reference to the case in 12 *Wendell*, 162, the defence

arising from the misjoinder, looks only to the extent of the judgment. It was not a defence to the action. The case was *replevin* for a horse against two, who had taken him at different times. The same doctrine is maintained in *Gould on Pleading*. The rule depends not on the fact, but on the character of the wrong. As it is true that the action of trespass will lie against more than one, and as the innocence of one, in fact or in law, is not a bar to the action, what objection can there be when the ground taken in defence assumes the guilt of the defendant, and simply denies responsibility to the whole extent of the plaintiffs' demand, to permit the action to proceed? If one entirely innocent may be united in the action with a guilty party, without defeating the action, why may not two, in part guilty, be united? The objection is grounded upon the distinct motives of the two defendants in bringing back the vessel; each wanted the property he had sold. Every agent has a different motive in the transaction— sheriff, labourers, and lawyer; but if they all united, they are all responsible for their act. The act of one, is the act of all. It cannot be that where several entering into a house, claiming and taking away separate portions of its contents, all are not responsible with reference to the party injured. If the refusal of the defendants' prayer was correct, the instruction given on that head was also correct.

Upon the 1st point, and 1st, 7th, and 8th prayers, and 10th and 11th instructions, after stating the nature of the objection, the counsel denied that this was the *replevin* of *Tyson & Norris.* He said it was not denied that cross *replevins* might be maintained. Then was the last *replevin*, in fact the action of *Tyson & Norris?* Who were *Tyson & Norris?* Who the plaintiffs? The plaintiffs, from 1832 to 1833, were the consignees of *Tyson & Norris* for the sale of produce, and accounted for proceeds to a large amount. It was the practice of *Tyson & Norris* to draw on the faith of the shipment, and their bills were accepted to enable them to procure advances. Plaintiffs came under acceptance to too large an amount. They refused further to accept, and in consequence

this shipment, destined for another port, was consigned to the plaintiffs. The bill of lading was sent them under the hope they would make further acceptances, and of drafts which they had previously noted. The bills of lading went on, and the vessel sailed from port. The question of ownership is as between plaintiff and defendant, and *in this point Tyson & Norris* are admitted to have no title.

A bill of lading is a negotiable instrument. *Lickbarrow vs. Mason*, 2 *Term Rep.* 63. And the only escape from the effect of the bill of lading, or the claim of the plaintiffs, arises from their insolvency. The bill of lading is a muniment of title; it is an infallible muniment, except as regards the vendor's right to stop *in transitu.* This right is personal to the vendor. A *tort-fesor* cannot protect himself by this privilege; it is founded on equity with reference to ownership; it is intended to protect the vendor against the vendee. It ceases with the possession of the vendee. *Walter, et al vs. Ross, et al,* 2 *Wash. C. C. R.* 294. *Ryberg & Co. vs. Sneel, ib.* 403.

An assignment of a bill of lading, to cover previous advances, is absolute, and defeats the right to stop *in transitu.* *Schimmelpennick vs. Bayard,* 1 *Pet. S. C.* 386. *Conard vs. Nicoll,* 4 *Pet. S. C.* 291. *Wood vs. Roach,* 2 *Dallas,* 180. *Woods vs. Roach & Crawford,* 1 *Yates,* 177. *Summeril vs. Elder,* 1 *Binney,* 106. *Stor. Abbott,* 308, 388. *Owings & Cheston vs. Nicholson & Williams,* 4 *Har. and John.* 107.

We do not deny that goods in the custody of the law are *irrepleviable;* still the right of property may be controverted in another suit, as in trespass or in trover. The legal custody does not take from the paramount owner the right to recover the value of his goods pending the custody, or after that has terminated, the specific goods from a third party. The objection prevents all interference with the goods so long as the custody continues, and the reason is, that if it were not so, the particular controversy in which the goods were taken, could never be settled. It is the privilege of the *first* plaintiff and the officers of the law, and to give the *first* plaintiff the fruits of his action. If only the true actual owner could main-

tain *replevin*, the courts would suffer it to proceed, but other persons may, as against wrongdoers. It is, therefore, a privilege which the plaintiff, in the first action, may waive, as any private right might be waived. Then did the defendants waive this privilege. There was no other right in the defendants in the *first replevin* than that of stoppage *in transitu* resulting from their consignees' insolvency. Those defendants were *Tyson & Norris*, who do not set up that right. They came forward as the plaintiffs' witnesses, and concede the plaintiffs' right to the property. This property being parted with by the sheriff, is not in the law. The legal custody had ceased. The custody under the first *replevin* was for the benefit of the plaintiff in that writ, and to enable the officer to do his duty; and the plaintiff may waive it.

.*Replevin* is to try title; it is co-extensive with *trover*, and may be brought in all cases by the owner, except where the goods are in the custody of the law, or where there are cross *replevins*.

There was then a waiver of the custody under the first *replevin*. Was there sufficient evidence of the fact? This inquiry arises on the 10th and 11th instructions. Was there any evidence tending to prove this waiver? See *Murray's* proof. The receipt for the goods demonstrates the waiver. It was dated on the 29th, the goods were delivered to the plaintiff in the last *replevin*, on the 27th. *Boggs' replevin* issued on the 25th, *Powell & Fiddeman's* on the 26th, the plaintiffs' on the 27th. The defendants' on the 29th sign a receipt for a delivery of the goods to them. There was no delivery in fact. Then the receipt must be a waiver of the right to demand it. The receipt is demonstrative evidence of this. It is no answer to this that the appraisement was still to be had. It would not now be competent to these defendants to set up the want of an appraisement, having renounced that benefit by a surrender of the property. But with reference to these defendants the appraisement has been made.

Then as to the 11th instruction. There being two *reple-*

*vins* in fact by the receipt, *Boggs* in effect agreed to look to the bond in this case, instead of retaining the property, and vindicating his rights under the first writ. Having agreed for value not to set up the irregularity of the taking under the second writ, he cannot now insist on it. No great principle of public policy or morality is at stake here. The defendants were competent to surrender. They could have quashed their writ, and may waive the custody under it, and for the first time at the trial they are not competent to set it up as an answer to the plaintiffs' demand, and to the merits of the cause. At least the receipt is evidence of an intention to waive, and we are entitled to its protection.

The appellant's 3d point includes the 1st, 2d, 3d, and 7th instructions, and the additional instruction added to the plaintiffs' 2d prayer below, and the defendants' 3d prayer.

It is here material to remark, that *Boggs'* flour was sold for cash, and *Fiddeman's* corn on credit. Did *Boggs*, by delivery of the flour to *Tyson & Norris*, intend to vest the title in them? By a general delivery of goods upon a sale and nothing said, the title vests in the vendee. *Chapman & Schoolcraft vs. Lathorp*, 6 *Cowen*, 110. 6 *Pick*. 162.

Did the usage change the character of the question so as to make the court's act erroneous? There is no difference between the effect of a contract expressly or by usage, for cash. Independent of usage title is not vested, unless by delivery, it was so intended. Now, waiver or no waiver of the cash payment, with reference to title, is a question of fact to be settled by a reference to all the circumstances prior and subsequent to delivery, and not by delivery only. The usage does not prove that the cash payment may not be waived. The only effect of the usage is to rebut the inference arising from the delivery, and to show that title still remained in the vendor. The objection argued is, that finding the usage, then no intent to give credit existed, without any reference to other circumstances. The flour was bought for shipment, and the vendees known to be shippers. *Boggs* is silent. No act done to get back the property, and the proof is, that the

title is not to depend on the payment of the purchase money. See *Tyson's* evidence. If the title may be waived, and permitted to vest, notwithstanding the cash payment is not made, then the jury was the proper tribunal to determine whether the fact existed. Suppose a usage existed *Cui bono?* cannot the vendor contract without reference to it? Found or not found, the usage is immaterial, if the evidence shows as it does here, that he did not contract with reference to it.

Defendants' 4th prayer, and 4th, 5th, and 6th, of the court's instructions. Fraud or no fraud in the original purchase. What is the fraud which will vacate the contract of sale in personal property? Can it exist independent of design? or if when concluded, there is no intent to deceive? Such a sale is not tainted, because, in fact there was no deception. Fraud, of which the law will take cognizance, exists not, independent of a mental reservation to deceive. If the party intended to act fairly, no charge of fraud can be sustained in human contracts. *Conard vs. Nicoll,* 4 *P. S. C. R.* 295. To constitute fraud there must be contrivance and design to deprive a party of his rights. We are not to confound evidence of fraud, with the fraud itself. The evidence of contrivance with the contrivance itself. *Hickly vs. The Farmers and Merchants Bank,* 5 *Gill and John.* 377.

The evidence is clear, that an intent not to pay, did not exist at the time of the purchase, and the facilities enjoyed by *Tyson & Norris,* show that they had grounds of belief that they could pay. Checks on the *Union Bank,* and drafts on *Boston,* were a present means of payment, and hence the general insolvency of the house not material. If they intended by the shipment to pay for the purchase, no fraud in law or morals; and the court said if they intended to pay, no fraud. The jury have found they intended to comply. It is therefore a question of evidence. The expectation not to pay, is evidence of an intent to defraud, but mere expectation is not *per se* the fraud, but the intent; the design not to pay is the fraud which vacates the sale. An intent must depend on the mind of the party where it was lodged. Insolvency

*per se* is not conclusive evidence of fraud. But it is said it must not be concealed ; it must be disclosed ; that it was not disclosed, which is a fraud, as alleged. Mere silence on the subject of insolvency, without any intent on the part of the purchasers not to pay, would have satisfied the prayer. *Noble v. Adams,* 7 *Taunt.* 59. False pretences are necessary to constitute fraud to vacate a sale of goods. 1 *Gren.* 376.

Defendants' 5th point relates to 5th prayer. It supposes an actual possession of the property, or an advance on the faith of the shipment was necessary, to enable the plaintiffs to maintain *replevin.*

The account current proves that on the 25th of April, at the time of the transmission of the bill of lading, *Bradlee & Co.* had advanced $3,293 36. The last draft was on the 16th April; then came the advice by letter, that the draft was noted. *Tyson & Norris* reply, that they still expected the acceptance or payment of their draft, to sustain that expectation and induce *Bradlee & Co.* to accept, made the shipment per the *Joseph.*

As to *Tyson & Norris,* the actual shipment of the cargo put it out of their power to stop the goods in their transit to *Boston.* No other person could interfere but *Tyson & Norris,* and they only in the execution of that particular right. *Ryberg & Co. vs. Sneel,* 2 *Was. C. C.* 404. The acceptances by *Bradlee* were on the faith of shipments made and to be made, but if not so, *Tyson & Norris* acknowledged they had drawn too close ; confessing that they shipped these goods to make that debt good. Then the effect of a shipment to pay an antecedent debt, is, that the right to stop *in transitu* is gone.

MAYER, for the appellees, contended :

That to nullify a cash sale for fraud in the vendee, there must be a design and intent not to pay. There was no fraud without a design to prejudice. In the common law sense of fraud you must find design to injure. *Earl of Bristol vs. Wilsmore & Page,* 8 *Serg. and Low.* 146. Cases resting on the policy of the law are decided on other grounds. It

34 v.9

is not sufficient to show a case of aggravated insolvency, nor how clearly the vendee may know his condition; yet if no intent to deceive, the property vests in the purchaser. Hopes spring from new contracts—new profits may discharge old debts. Experience demonstrates this. Many cases of desperate fortunes are restored by new operations of skill, sagacity, and enterprize. Men constantly raise themselves superior to ancient embarrassments. To vacate their contracts an intention to deceive must exist. And why should it not be so? A purchaser obtains an equivalent for the claim against him in what he buys; that furnishes him with the means of payment. Suppose a man begins the world without a dollar, he lays the foundation of future fortune in a purchase. Are his acts void, because of current liabilities for his subsistence? His dearth of means is not to avoid his contracts. Nothing is more unjust than to make conscious insolvency sufficient *per se* to nullify purchases. Such a principle would lead to the most pernicious consequences; but the law does look to the *bona fides* of the transaction. If his intentions are not dishonest, his contracts are valid, and may lift him above trouble. If intent must be found, and so are the cases, the principles ought not to be expanded. Here were well founded expectations of ability to retrieve affairs. Honest objects and expectations; intervening rules of a bank with which they previously traded stopped them. Expectations are equivalent to intentions; but if distinct, does it become necessary to prove both? The rules contended for on the other side would lead to confusion, Parties ought to look well to the situation of those they deal with, and the court below has not invaded the standard decisions on such subjects.

Actual possession is not necessary to maintain *trover*. Cases of special property have sustained it. *Fowler vs. Down*, 1 *Bos. and Pull.* 46. At common law actual delivery was not necessary to a purchase for value, or in discharge of a precedent debt.

Our recording laws admit that delivery of a chattel is not necessary to vest title in a purchaser.

The evidence shows that the defendants were joint tres-passers; they were together; *Boggs* on board, *Fiddeman* took possession. The sheriff was excused. The use of process did more wrong; it was an abuse. They took all the plain-tiffs were entitled to; and the argument now demands an ap-portionment of the wrong between *tort-fesors. Isley, et al vs. Stubbs,* 5 *Mass.* 283. The wrong always relates to the original taking, and its being done under color of the *reple-vin,* increases the wrong and trespass. Misjoinder here is merely matter in abatement.

In *replevin* the plaintiffs may recover part. There may be judgment as against one defendant for one part, and against another defendant for a different part. Defendants may sue for several parts. But here there was one original joint ta-king. Plaintiffs are not to be defeated for a misjoinder; they had had a right of election between the defendants.

McMahon, for the appellants, in reply.

I propose to consider:

1. Whether the plaintiffs in the *replevin* had any right.
2. The property of the defendants.
3. Was the writ properly served?
4. The question of delivery.
5. The fraud in the sale.

1. Has the plaintiff a title to maintain the action of *re-plevin*?

*Replevin* has taken the place of *trover.* It involves title to possession. Injury done to a possessory right. What is the character of the right set up by the plaintiffs?

*Tyson & Norris* were general owners; that is conceded. The title of factor is either for a general lien, or it is a spe-cial title in the goods. Factor, with a special property. 2 *Wm. Saund.* 47, (*a*) *note.* Mere possession will not maintain the action. A mere factor, without interest, can-not sue. The special property is a right to keep the goods for some purpose of the owner. A mere intent to vest pro-perty does *per se* vest it. It must be followed by actual or

constructive delivery. Either is sufficient. If the bill of lading was once in his possession, that symbolical delivery was sufficient. In this case the plaintiff had neither possession of the bill of lading, nor the property. There was a mere intention on the part of *Tyson & Norris* to give the plaintiffs the property. *Walter, et al vs. Ross, et al.* 2 *Wash. C. C.* 283, 290.

There was a constructive condition to perform an object never accomplished. See the correspondence. The title was not to vest, unless the bills were accepted. They were not accepted. Hence the title, the right remains. 3 *Pet. C. C. R.* 112. *Walter, et al vs. Ross, et al,* 2 *Wash.* 295, 296. *Ryberg, et al vs. Sneel,* 404. *Abbott. Ship,* 206, (*No.* 1.) *Hotchkiss vs. McVickar,* 12 *John.* 406, 407. Before bill of lading received how could *Bradlee* have disposed of the property? *Tyson & Norris'* general property remained; the special property never attached. *Coxe vs. Harden,* 4 *East.* 217. If the plaintiffs here got a right of lien for antecedent advances without acceptance, they get a right without any corresponding consideration or value.

2. The inquiry here is, where two took distinct parcels of property without any union or concert, can they be united in the same action?

*Boggs* went for his flour, takes it; never touches the corn. Why is he united with *Powell?* There was no joinder in the caption of the property. A mere *juxta-position* of the agents. This does not make joint trespassers. The prayer says there was no joinder, and if the jury so found the fact, then what is the law? The prayer assumes there was no joinder, and if the jury so found the fact, what is the conclusion of law? *Gould Plea.* 204, 209. *Sprague vs. Kneeland,* 12 *Wendell,* 164.

Where the joinder is good in law, and erroneous in fact, when is the objection to be taken? I contend it can only be taken on the evidence. When the proof is offered, the time has come to raise the objection. Then as to the form of taking the objection. Is it matter of election or not? How is the election to be exercised in a case where two are sued,

and you prove one cause of action against one, and another cause of action against another? Two cases in fact. Then who is to elect after the jury is sworn? Who is to be turned out? The right is in the plaintiff. Suppose he exercises it, and takes a verdict for the corn, and loses the cause as to the flour. What is the effect of that verdict? You cannot *non pros.* as to part. Suppose the plaintiff had declared on the fact. Demurrer would have defeated the suit. The plaintiff cannot proceed until he aids the defect, and dismisses his suit as to one.

MAYER, for the appellees, at this stage of the cause, said:

In answer to the objection of a misjoinder, that however it might apply to the plea of *non cepit*, it did not apply to the plea of property. *Replevin* was a proceeding in *rem* except as to the plea of *non cepit*. *Wilkinson on Rep.* 50. 6 *Law Lib.* 18. There was no judgment for a return on the plea of *non cepit*. It was only on pleas disaffirming the plaintiffs' right of property, that a return is awarded. The caption and detention, and question of property, are distinct. When property is not put in issue, although the defendant may succeed on the plea of *non cepit*, he is not necessarily entitled to the property. A return depends on the justice of the defence. The judgment is rendered according to the reason of the thing and justice of the claim, and is moulded accordingly.

Under the bill of lading and letters, it is denied that our property would not enable us to maintain the action. *Haille vs. Smith, et al,* 1 *Boss. & Pull.* 563. *Griffith vs. Ingledew,* 6 *Serg. and Raw.* 429. Although goods are at the risk of the consignor, still the right to recover possession of the goods is in the consignee. This is the effect of the bill of lading in the modern mercantile law. *Morrison vs. Gray,* 9 *Serg. and Low.* 405. 3 *Camp. N. P.* 6 *Bac. Ab.* 73.

McMAHON, for the appellants, resumed the reply.

3. Was the writ properly served? and in connection the defendant was entitled to his prayer, and the instruction as given on this head was erroneous.

The time of the agreement was considered doubtful, and the prayers presumed:

1. As if the agreement was made after the delivery.

2. As if made prior to the delivery.

Then under the first view, if the goods were in the custody of the law, the *replevin* was not maintainable.

Then on the supposition that the agreement was made after the service of the writ. The court below, seemed to have admitted that if there were no agreement, *a priori,* the action was gone. If that is the law, have the court below granted our prayer as they ought to have done? Is it covered by the instructions? In such a case the instruction ought expressly to cover the ground of the rejected prayer, and not leave it to inference. See 10th and 11th instructions.

The object of that principle which declares that goods in the custody of the law shall be held sacred, is to prevent all interference with the possession—" all hands off "—until the office of the law has been performed, as to the process under which it was taken. In this cause the writ is to seize property—appraise it—place that on record as evidence of the valuation. Then the property is to be delivered over to the plaintiff. This is the public policy, and none can interfere with it. It is for the benefit of plaintiff and defendant. Then can one party waive the exactions of duty in which the other is interested? As to an appraisement for the defendant, the plaintiff cannot waive it. The new *replevin* let the old action go on. Dispensing with the appraisement, the defendant might remain remediless as to the value. Many practical disadvantages readily present themselves for illustration.

As a general rule it cannot be contended, that the plaintiffs and the officer may agree to waive the duty of the officer. The counsel feeling this, put *Tyson & Norris* on the ground of co-labourers with the plaintiffs—as abandoning the property to them by the plaintiffs.

The office of the writ can only be waived by the agreement of *both* parties, and which must be at the time of service, and a subsequent agreement will not avail here as it

leaves the property in the custody of the law, at the period of the execution of this writ.

Then as to the *corn*. *Wilson*, the sheriff, executing the *replevin* of the corn, made no agreement. *Murray* made one as to the flour. *Boggs* had no power over the corn which was in custody at the time of the service of the 2d *replevin*. Is the custody as to the corn waived, and how? The act of waiver it is contended, is in the written receipt. The whole act is in writing. The paper is the evidence of the waiver, and the court, by the 11th instruction, have put the construction of the paper to the jury. This was error. The construction of the receipt was for the court, who should have determined what the signers intended by it. It was for the court to say, waiver or no waiver.

Under what circumstances do the court say it may operate as a waiver? If combined with *parol* evidence, that with the paper, might be left to the jury. But in such case the court should have instructed the jury what circumstances were necessary to constitute the receipt a waiver; the preliminary facts on proof of which the paper might operate as a waiver. The knowledge of *Boggs'* flour being receipted for, could have no influence on the rights of the other parties. · The evidence is not put on the ground of an agreement made for *Powell* and confirmed by him, but because another made an agreement and *Powell* knew it, it is inferred that *Powell* designed to waive his right. When an irregularity of procedure is to be waived, it should be known, and the waiver predicated on it. Here, then, is no evidence that *Powell* knew there was irregularity. The receipt and parol agreement were made with *Boggs*, it has no reference to any irregularity; the agreement might or might not apply to that; the jury, therefore, should have been instructed to find the knowledge of *Powell* of this irregularity. Waiver is an intentional act, founded on intent, as that a party made a *waif* of his right. He knew he had it—threw it away—no such fact put to the jury.

The service of a writ on property in the custody of the law, is a nullity; it is a void act, and so the court will ever re-

gard it. 3 *Chitty Prac.* 522. An irregularity may be waived; a void act cannot be waived. A nullity is some essential defect in procedure. Where the law has prohibited an act, it is an essential defect to proceed against it. A step in a cause, inconsistent with the idea of antecedent proceedings, being a nullity, is no waiver of objection of that ground where it exists.

What is of the essence of waiver? Implied waiver is an act done inconsistent with that which is insisted on as an objection. The objection is, that the corn was in the custody of the law, because it was *not* delivered to *Powell.* There is merely a receipt for the corn on the 29th April. This is no waiver of the misconduct of the plaintiff in suing forth his writ on the 26th April. At least the receipt is an equivocal act, and to make it operate as a waiver, the plaintiffs who relied on it in that character, should have furnished the additional proof.

Upon the question of fraud, I contend, that an assignee will be regarded as the vendee, except where the former has given value. Where the property fraudulently acquired is surrendered in payment of a precedent debt, it will not avail the assignee as against the injured party. *Root vs. French,* 13 *Wend.* 570.

In such inquiries nice questions of insolvency ought not to be entertained; but a man engaged in business, known to himself to be insolvent, to such a degree that the vendor would not trust him, does commit a fraud in purchasing for cash. If non-payment is the sole fraud, the intent to pay may give the rule; but such intent is not the sole fraud. It is not the only evidence in this case.

In a contract of sale, as between vendor and vendee, good faith must be observed in the making.

Whatever good faith requires to be disclosed, is as objectionable in law and morals when not disclosed, as to mislead.

The exceptions are, where the grounds of knowledge are equally to both parties, what is called the judgment of the quality of an article purchased.

Would knowledge of insolvency be likely to influence parties in making contracts? Is it material? Is there no obligation to disclose a fact which would prevent the contract? Concealment is wilful withholding. If a party misrepresents, the courts will vacate his acts. Fraud is the suppression of truth. What honesty demands is to be disclosed; non-disclosure is suppression. The decisions have not shut out these principles, and commercial policy cannot sanction opposite doctrines. *Chapman & Schoolcraft vs. Lathorp,* 6 *Cowen,* 116, 117. *Lupin, et al vs. Marie,* 2 *Paige,* 172.

The instruction of the court below looks to the *non-intent* to pay at the formation of the contract, as the only ground of fraud. I deny this principle. The meditation to defraud, is not always necessarily material. Consequences which are fraudulent, are sufficient to vacate; they work a fraud independent of intention, as where an insolvent, without any reasonable hope to pay, contracts. Will any one say that is not void? He has not a plank to swim on; no reasonable expectation to pay. Reliance on friends will not do. In such a case his intent is not material; from his position as purchaser, he practised a fraud. *Hawse vs. Crowe,* 21 *Serg. and Low.* 477. *Noble vs. Adams,* 7 *Taunt.* 61. 17 *Serg. and Low.* 290. He is bound to disclose; non-payment is the necessary result of his act, which is a fraud.

The instruction has a tendency to mislead the jury; it left open that both the want of means, and the intent to defraud must be found. It has been put as if the want of means was not evidence of intention. The insolvency was established before the delivery of the goods. I consider the distinctions between fixed design, and a spirit of reckless adventure futile and ridiculous; that the purchases of both are equally unlawful and fraudulent.

Then again, is the deposite of the bill of lading in the post office at *Baltimore,* a delivery to the consignee at *Boston*? If we admit that, if the bill of lading had been received by the consignees, the question still recurs, would that have conferred title? *Morrison vs. Gray and another,* 9 *Serg. and Low.* 405,

35 v.9

is an authority for the appellants.    The bill of lading in its transit, is not more efficacious than the goods in their transit. The representative, the bill of lading, is not more effective than its principal, the goods.    It is at most but a constructive delivery.    Then can a factor, constructively in possession, of what is constructively his, bring his action of *replevin* for property, constructively delivered to the defendant?    It seems to me not.

STEPHEN, J. delivered the opinion of the court :

This case involves several questions, some of which are of considerable importance, and the decision of which is attended with no little difficulty.    It is an action of *replevin*, instituted in the court below, by the appellees against the appellants, to recover a quantity of corn and flour, which had been sold by separate and distinct contracts by the appellants to certain persons, from whom the appellees claim to have derived title.    We do not think that the county court were wrong in rejecting the defendants' first prayer.    The principle is unquestionable, that property while in the custody of the law cannot be *replevied ;* and the reason is, that the law will not be so inconsistent with itself, as to be auxiliary or lend its aid to an act which would operate to defeat its own purposes. But the court were called upon to instruct the jury, that if they found that the writ of *replevin* which issued in this case, was executed before the service of the first *replevin* upon the same property, and while it was in the custody of the sheriff, then the plaintiff was not entitled to recover.    There being evidence in the cause to go to the jury, to prove a waiver on the part of the plaintiffs in the original *replevin*, of the delivery of possession to them, under their writ against the defendants in that action, the court would have erred in giving a positive instruction to the jury, in the manner required by the defendants' *first* prayer.

We think that the court below did not err in refusing to grant the defendants' *second* prayer to the extent to which they were asked to instruct the jury ; that is to say, that the plain-

tiffs could not recover at all in that suit, upon the state of facts assumed by the prayer, and upon which it was predicated.

Without deciding whether two defendants can be sued jointly in one action of *replevin,* for several parcels of property, severally owned and separately taken and detained, we think that such a misjoinder (if it be one) would not have warranted the instruction asked from the court, because such an objection is not altogether fatal to the action; but the defect may be cured by putting the party to his election, as was done in 2 *Johns. Rep.* 228. And we find also, that a misjoinder of counts in a declaration, may not only be cured by an exercise of the right of election, but also by the verdict of the jury finding for a plaintiff on one count, and for the defendant on the other; as where an action is brought against a defendant in his personal, and also in his representative capacity, which would be a misjoinder of counts; the defect may be cured by verdict. *Gould Plea.* 217.

The court, we think, were also right in rejecting the defendants' *third* prayer, because there being evidence in the cause of usage to deliver the flour when sold for cash, without demanding the cash at the time of delivery, the instruction asked for by the defendants' prayer, that no property passed on the delivery unless the cash was paid or tendered at that time, was properly rejected by the court, as such an instruction would have withdrawn from the jury the consideration of such usage, and the effect of it upon the contract in this case, as to the necessity of making such payment simultaneously with the delivery of the flour purchased.

We do not think that the court erred in refusing the *fourth* prayer of the defendants, relative to the insolvency of *Tyson & Norris,* at the time they made the purchases of the flour and corn in this case. The prayer seems to have been founded on the idea, that the sale was fraudulent if the vendees knew themselves to be insolvent at the time of the purchase, and did not communicate that circumstance to the vendors; knowing at the time that they were ignorant of the fact, and had not the means of becoming acquainted with it. The law, it

seems, does not sanction such an elevated tone of morality in mercantile dealings, as would have warranted the granting of the prayer, to the extent asked for by the defendants in this case.   Such a strict and rigid doctrine, considering the vicissitudes and changes incident to mercantile life, would go far to cramp the operations of trade and commerce, and has not received the countenance of the courts of justice, either in this state or elsewhere, as far as we have been able to ascertain. Moreover, the proceeds of sales of the property purchased, might have enabled them to fulfil their contract, and from any thing which appears might have been intended to be applied to that purpose.

Nor do we think that the court erred in refusing to grant the *fifth* prayer of the defendants.   By the terms of the bill of lading, the property was to be delivered to *Josiah Bradlee & Co.* or to their assigns, he or they paying freight for the same. This we think vested the legal title in them, and enabled them to maintain the present suit.   "If goods by a bill of lading are consigned to A, he is the owner, and must bring the action if they are lost; but if the bill be special to be delivered to A, for the use of B, B ought to bring the action."   2 *Liver. on Agen.* 117, and the cases there cited.   In 6 *Serg. and Raw. Tilghman*, Ch. J. says, "in deciding on the legal property, the court will look to the face of the bill of lading; but in ascertaining the equitable owner, the invoices, letters of advice, and other collateral evidence, will be resorted to."

For reasons already given, we think the court did not err in refusing to grant the defendants' *sixth* prayer, to the full extent to which they were asked to go in their instruction to the jury.

We think the court were right in refusing to grant the defendants' *seventh* prayer, because there was evidence to go to the jury, from which they might have found a waiver of actual delivery by the plaintiffs in the original *replevin*, and the granting of the instruction by the court, might have tended to mislead the jury as to their right to make such deduction.

We think the court were also right in refusing the defen-

dants' *eighth* prayer, because there was evidence to go to the jury, from which they might have found a waiver of the delivery of the corn before the service of the writ of *replevin* issued in this case.

We think the court below were also right in refusing the defendants' *ninth* prayer, for the reasons we have already assigned in a preceding part of this opinion. The misjoinder of the causes of action, if it was one, did not go *totally* to defeat the action, and therefore did not warrant the prayer to the full extent in which it was made.

For the same reason, we think the court below committed no error in refusing to grant the defendants' *tenth* prayer.

After refusing the defendants' prayers, the court delivered several instructions to the jury, the accuracy of which is brought before this court for revision, and which will now be considered and decided upon.

We fully concur with the court below in their *first* instruction to the jury. Although the sale of the goods was for cash, yet it was competent for the vendors to waive the cash payment by an unconditional delivery of the goods, without a concurrent demand of the money at the time the delivery was made. They had a clear right to dispense with the cash payment, and it was unquestionably waived by an unconditional delivery, unaffected by any fraud on the part of the purchaser in obtaining it. In such a case, the condition of payment simultaneously to be made according to the contract, would be waived, and the right of property would pass.

We can perceive in the *second* instruction of the court to the jury no error, except that they have withdrawn from the jury the decision of the question of fraud in the *purchase* of the property. This was no doubt inadvertently done, as their attention was very properly drawn to the consideration and decision of that fact in the previous instruction.

It does not appear that the court have committed any error in their *third* instruction to the jury. The court rightly left it to the jury to find the fact of usage, and to decide whether the vendors of the articles acted in reference to it at the time

of the delivery, so as to prevent the delivery, if made unconditionally, from operating as a waiver of the cash payment. If the delivery was unconditional, and without reference to the usage, the title passed. If it was made with reference to the usage, which was a question of intention, then the title did not pass, if the cash was not paid when thereafter demanded.

In making the delivery, it was unquestionably competent for the vendors to waive the saving operation of the usage upon their rights; and to transfer the title by an unconditional delivery if they thought proper to do so.

We concur with the court below in their *fourth* instruction to the jury, as to the invalidity of the contract upon the ground of fraud, upon the hypothesis that the jury should find the facts therein stated, to be true; but we think they erred, in telling the jury that the plaintiffs would, nevertheless, acquire a good title by the bill of lading, if they became creditors subsequent to the delivery of the goods to *Tyson & Norris,* (of which fact there was not a particle of proof,) and without adding that they became such creditors, *bona fide,* upon the faith of the consignment and shipment of those very goods. Upon no other grounds could they acquire a right, when none passed to the persons under whom they claimed. In such a case, good faith, and a valuable consideration, would be essential constituents of a good title in any person claiming under them.

We think the court erred in the *fifth* instruction given by them to the jury, in directing the jury, that *before* they could find the sale of said goods fraudulent and void, they must find that *Tyson & Norris* knew that they were not able to pay for the goods, and that they would not be able to pay for them, and neither intended nor expected to pay for them. The jury could not well find that *Tyson & Norris* knew that they would not be able to pay; it was sufficient for the jury to find, in that respect, that they knew themselves to be insolvent, and had no reasonable expectation of paying for the goods purchased. The necessary tendency of such an in-

struction was calculated to bewilder, embarrass, and mislead the jury in their deliberations, and was therefore erroneous. In 21 *Serg. and Low.* 477, the above principle seems to be decided.   In that case, a vendee, under terms to pay for goods on delivery, obtained possession of them by giving a check which was afterwards dishonoured, and the court held, that he gained no property in the goods, if at the time of giving the check, he had no reasonable ground to expect that it would be paid.   The transaction would be fraudulent, and the property would not pass.

For the reasons already given, we think the court below were right in their *sixth* instruction to the jury.

We think the court below erred in their *seventh* instruction to the jury, by requiring them, before they found against the plaintiffs, to find that the plaintiffs never made to *Tyson &* *Norris* any advances, nor contracted for them any responsibilities upon the faith of said consignment, when there was no evidence in the cause upon which the jury could find such a fact.   Such an instruction was erroneous, as tending to mislead the jury in the formation of their verdict.

For similar reasons, we think the court erred in their *eighth* instruction to the jury, by requiring them to find that certain facts did not exist, of which there was no evidence, before they could find a verdict against the plaintiffs, and that they had no right to recover.   Such instruction was calculated to mislead the jury, and was therefore erroneous.   There was no evidence in the cause of any advances made, or responsibilities incurred by the plaintiffs for *Tyson & Norris* on account of said corn or flour.

We can perceive no error in the *ninth* instruction.   If the goods were sold on credit, and not for cash, and were delivered to the purchasers in the absence of fraud, there can be no doubt that the property passed from the vendors to the vendees, and the plaintiffs would be entitled to recover.

The *tenth* instruction we think was also correct.   It was no doubt competent for the *Boggs*, one of the defendants, to make the agreement, dispensing with the actual delivery of

the goods for which the writ of *replevin* issued, so as to legalize the execution of the process of *replevin*, then in the hands of the sheriff, and which he was about to execute for the plaintiffs in this suit.    If he did make such an agreement for that purpose, he would be precluded by it from raising the objection, that the goods were in the custody of the law, on the ground that such an objection, thereafter, would be fraudulent, and a violation of fair dealing and good faith.

We cannot, however, concur with the court below, in their *eleventh* instruction, which does not stand upon grounds equally tenable with those contained in the next preceding instruction.    There was no agreement to be found by the jury, dispensing with the delivery of the corn, for the purpose of enabling the officer to execute the writ of *replevin* then in his hands, previously to the execution of that writ; and the objection, that the goods were in the custody of the law when the writ of *replevin* was executed, might well have been made, without any violation of good faith, even if the hypothetical statement of facts contained in the court's instruction had been found by the jury to have existed.    The subsequent ratification of the act of the officer in making the *replevin*, if found by the jury, would have been purely voluntary, and being founded upon no valid consideration, was not obligatory upon the defendants.

JUDGMENT REVERSED AND PROCEDENDO AWARDED.